# UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| -------------------------------------------------------- | x | |
| *In re* | : | |
| | : | Chapter 11 |
| MEMORIAL PRODUCTION PARTNERS LP, | : | |
| *et al.*, | : | Case No. 17-30262 |
| | : | |
| Debtors. | : | Jointly Administered |
| -------------------------------------------------------- | x | |
| BETA OPERATING COMPANY, LLC | : | |
| | : | |
| Plaintiff, | : | Adversary Proceeding No. _____ |
| | : | |
| v. | : | |
| | : | |
| AERA ENERGY LLC, NOBLE ENERGY, | : | |
| INC., and SWEPI LP, | : | |
| | : | |
| Defendants. | : | |
| -------------------------------------------------------- | : | |
| | x | |

**COMPLAINT FOR (1) DETERMINATION OF PROPERTY OF THE ESTATE, (2) DECLARATORY RELIEF AS TO ABILITY TO CONTROL DISPOSITION OF FUNDS, (3) DETERMINATION OF UNIMPAIRMENT OF CLASS 3B CLAIMS, (4) APPROVAL OF THE PLAN'S TREATMENT AS TO CLASS 3B CLAIMS, (5) OBJECTION TO CLASS 3B CLAIMS PURSUANT TO 11 U.S.C. § 502(e), AND (6) LIMITATION ON POSTPETITION LIENS PURSUANT TO 11 U.S.C. § 552, AND RELATED RELIEF**

Plaintiff Beta Operating Company, LLC ("Beta"), on its own behalf and as successor in interest to Rise Energy Beta, LLC ("Rise"), through its undersigned counsel, brings this action against defendants Aera Energy LLC ("Aera"), Noble Energy, Inc. ("Noble"), and SWEPI LP ("SWEPI" and with Aera and Noble, "Previous Owners"), and, in support thereof, respectfully alleges as follows:

## NATURE OF ACTION

1.      Plaintiff and the other Debtors filed petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), on January 17, 2017.  Debtors commenced their cases with a pre-packaged, joint plan of reorganization ("Plan") with the support of their noteholders and lenders.  This Court confirmed the Plan in its Order dated April 14, 2017 ("Confirmation Order").  The Plan became effective on May 4, 2017.

2.      The Debtors have emerged from bankruptcy, significantly deleveraged and better positioned for long-term success.  Nevertheless, the Debtors' reorganization is not complete.  The Plan provides that the claims of the Previous Owners are classified in Class 3B and will receive the treatment provided therein.  Pursuant to the Confirmation Order and agreement of the parties to this action, confirmation of the Plan's treatment of the Previous Owners' Class 3B claims was deferred until entry of a subsequent Court order.

3.      The Previous Owners assert contingent, unliquidated claims for reimbursement or contribution for plugging and abandonment obligations ("P&A Obligations"), relating to certain petroleum assets owned and operated by Plaintiff located in federal waters off the coast of Southern California ("Beta Assets").  The Previous Owners' claims are putatively secured by a junior interest in the res of a revocable trust

("Beta Trust") that was established for the benefit of the Bureau of Ocean Energy Management ("BOEM") and its predecessor, the Minerals Management Service ("MMS"), agencies within the U.S. Department of the Interior.[1]

4.     Pursuant to the Plan, the Debtors intend to replace $62 million of the cash in the Beta Trust with an equal amount of dual-obligee performance bonds (the "Proposed Beta Surety Bonds"), and invest the balance of the cash in cash-equivalent, interest-bearing U.S. treasury notes (together with the Proposed Beta Surety Bonds, the "Proposed Beta Security"). The Proposed Beta Security will fully secure the Debtors' P&A Obligations. As is the case with the res of the existing Beta Trust, BOEM will have first priority to the cash equivalents and the bond proceeds, and the Previous Owners' interests will be junior thereto. The Proposed Beta Surety Bonds are compliant with federal regulations and will be in form and substance acceptable to BOEM, providing with the rest of the Proposed Beta Security adequate security for the P&A Obligations. The Proposed Beta Surety Bonds will be issued by Argonaut Insurance Company ("Argo"), an A.M. Best Ratings Services rated A (Excellent) surety company, or a similarly rated surety company.

5.     Significantly, the Plan's treatment of the Previous Owners' Class 3B claims is entirely consistent with the existing agreements among the Previous Owners, Plaintiff, and Plaintiff's predecessors-in-interest. The Previous Owners expressly agreed that they would accept whatever types of security BOEM required, including U.S. Treasury notes

---

[1]   By order of the Secretary of the Interior dated May 19, 2010 (Order No. 3299), MMS was split into three new federal agencies: BOEM, the Bureau of Safety and Environmental Enforcement, and the Office of Natural Resources Revenue. MMS was formally dissolved on October 1, 2011.

and performance bonds.  The only requirement applicable to such security is that it provide at least $90 million in security.  Thus, the relevant documents provide that the Previous Owners were indifferent as between cash, U.S. Treasury notes, or bonds; as long as the security amount does not fall below $90 million, the Previous Owners deferred to BOEM and Plaintiff.

6.     Indeed, the agreements also clearly contemplate that the BOEM-required security may be reduced below $90 million.  In that instance, independent security would be provided to Aera, such that BOEM/Aera collateral equals no less than $90 million.[2] Here again, the agreements provide that Plaintiff could provide such independent security in any one of several specifically enumerated types, including U.S. Treasury notes and performance bonds such as the Proposed Beta Surety Bonds.

7.     The Proposed Beta Security will be in excess of $152 million, more than equating to the Previous Owners' existing, negotiated-for security interests, thus giving the Previous Owners the benefits they bargained for and leaving them unimpaired as provided in Bankruptcy Code section 1124.  Moreover, even if the Previous Owners are found to be impaired, the Plan provides that they will receive the indubitable equivalent of their existing collateral, and thus satisfies the requirements of Bankruptcy Code section 1129(b).

8.     Unfortunately, notwithstanding the Previous Owners' prior agreement to accept exactly what BOEM accepts, including security in the form of performance bonds, the Previous Owners objected to the Plan, as well as to the attempts by BOEM and Plaintiff

---

[2]     The $90 million minimum security terminates upon the occurrence of certain events, including *inter alia* the complete satisfaction of the P&A Obligations.

to exercise their own contractual rights. ***Indeed, just a few months prior to the commencement of the Debtors bankruptcy cases, the Previous Owners took steps to frustrate a clear direction from BOEM to do precisely what the Debtors seek to do here: replace the Beta Trust res with surety bonds***.

9.        Thus, the Debtors are compelled to commence this action to complete their restructuring.  Notwithstanding the relevant agreements between the Previous Owners, Plaintiff, and Plaintiff's predecessors-in-interest, the Previous Owners seek to benefit from Debtors' bankruptcy filing—even in the face of a cooperative arrangement between Plaintiff and BOEM.  Seemingly, it will take an order of this Court to ensure the Previous Owners do not continue to frustrate an agreement between Plaintiff and BOEM and block the consummation of Debtors' orderly and effective reorganization by holding hostage $152 million in cash that is property of Debtors' estate.

10.        In view of the foregoing, Plaintiff brings this action requesting entry of an order: (1) determining that the Beta Trust res is property of the Debtors' bankruptcy estate pursuant to Bankruptcy Code section 541; (2) determining that the Previous Owners do not have a right to veto BOEM's disbursement orders with respect to the res of the Beta Trust, pursuant to the terms of the agreements governing the Beta Trust and the Previous Owners' interest therein, and that, even if the Previous Owners have such right, they may be ordered to consent to such direction pursuant to Bankruptcy Code section 1142; (3) declaring that the treatment of the Previous Owners' Class 3B claims under the Plan constitutes unimpairment pursuant to Bankruptcy Code section 1124, because it is consistent with the Previous Owners' existing contractual rights; (4) approving the Plan's treatment as to Class 3B claims, either because the Plan will not impair the Class 3B claims pursuant to

Bankruptcy Code sections 1124 and 1129(a)(8)(B), or, in the alternative, pursuant to Bankruptcy Code sections 1129(b)(1) & (2)(A) as providing the indubitable equivalent; (5) disallowing the Previous Owners' Class 3B claims as contingent claims for reimbursement or contribution under Bankruptcy Code section 502(e), and limiting the amount of any interest that the Previous Owners may have under Bankruptcy Code section 506(d) to the Beta Trust res or the indubitable equivalent thereof; and (6) ordering that the Previous Owners shall have no claim against or any interest in any additional security provided by Plaintiff to BOEM in excess of the res of the Beta Trust or its indubitable equivalent, in accordance with Bankruptcy Code section 552(a).

## JURISDICTION AND VENUE

11.     This is an action pursuant to Rules 3007, 3020, and 7001 of the Federal Rules of Bankruptcy Procedure and Bankruptcy Code sections 502(e), 506(d), 541, 552, 1124, 1128, 1129, and 1142.

12.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) because it arises under the Bankruptcy Code and arises in the Debtors' chapter 11 cases.

13.     Venue is proper in this Court under 28 U.S.C. § 1409(a) because this is a proceeding arising under the Bankruptcy Code and arising in the Debtors' chapter 11 cases, which cases are pending in this District.

14.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) (matters concerning the administration of the estate), (B) (disallowance of claims), (K) (determination of the validity, extent, or priority of liens), (L) (confirmation of a plan), and (O) (proceeding affecting the liquidation of estate assets or the adjustment of debtor-

creditor relations).  *See In re Black Elk Energy Offshore Operations, LLC*, 2016 Bankr.

LEXIS, at *1 (Bankr. S.D. Tex. Nov. 9, 2016) ("Determining whether an asset is estate

property is a core matter under 28 U.S.C. § 157.").

## THE PARTIES

15.     Plaintiff Beta is a Delaware limited liability company with its principal

place of business located at 500 Dallas Street, Suite 1600, Houston, Texas 77002.  Pursuant

to the Plan's restructuring transactions, on April 27, 2017, Rise merged into Beta.

16.     Plaintiff and the other Debtors filed petitions for relief under chapter 11 of

the Bankruptcy Code on January 17, 2017.  Plaintiff is a reorganized debtor in these jointly-

administered chapter 11 cases.

17.     Defendant Aera is a California limited liability company with its principal

place of business located at 10000 Ming Avenue, Bakersfield, CA 93311-1302.

18.     Defendant Noble is a Delaware corporation with its principal place of

business located at 1001 Noble Energy Way, Houston, TX 77070.

19.     Defendant SWEPI is a Delaware limited partnership with its principal place

of business located at 200 North Dairy Ashford Road, Houston, TX 77079.

## FACTUAL BACKGROUND

### A.    THE PREVIOUS OWNERS' SALE OF THE BETA ASSETS RECOGNIZED THE EQUIVALENCY OF SURETY BONDS

20.     The Beta Assets are petroleum assets located in federal waters off the coast

of Huntington Beach, California.   The assets are leased from the federal government

pursuant to three leases entered into in 1976: OCS-P 0300, OCS-P 0301, and OCS-P 306.

The assets include two wellbore production platforms with permanent drilling equipment

systems, referred to as the Ellen and Eureka platforms, and one production handling and processing platform, referred to as the Elly platform.  Beta is the current owner and operator of the Beta Assets.

21.    The Beta Assets were owned by the Previous Owners until about ten years ago.  In late 2006 and early 2007, the Previous Owners executed purchase and sale agreements and assignments of their interests in the Beta Assets ("Original Beta Sale") to Rise's predecessor in interest, third-party Pacific Energy Resources Ltd. ("PERL"). Because the Original Beta Sale included an assignment of Outer Continental Shelf ("OCS") leases, the Department of the Interior's approval was required in order to consummate the sale.

22.    The Department of the Interior is responsible for managing development of U.S. offshore resources, including offshore leasing, resource evaluation, review, and administration of oil and gas exploration and development plans.  At the time of the Original Beta Sale, it undertook these responsibilities through BOEM's predecessor agency, MMS.

23.    The Department of the Interior conducts ongoing reviews of the decommissioning liabilities of OCS leaseholders, both periodically and pursuant to certain triggering events, including assignment of a record title interest.  Based on these reviews, OCS leaseholders must post supplemental security in an amount sufficient to provide for the predicted decommissioning liability, in order "to ensure that U.S. taxpayers never have to pay for decommissioning and removing a company's offshore production facility."  *See BOEM Announces Updated Financial Assurance and Risk Management Requirements for Offshore Leases*, July 14, 2016, *available at* https://www.boem.gov/press07142016/.

24.     As the buyer of the Beta Assets, PERL became liable for the P&A Obligations associated with those assets.  Per the Department of the Interior's practice and regulations, PERL provided the federal government with security for the P&A Obligations. Acceptable forms of security included (and still include) surety bonds, pledges of U.S. Treasury securities, abandonment accounts, third party guarantees, other specifically approved forms of security, or a combination of security methods.  *See* 30 CFR §§ 556.900 *et seq*.

25.     The fact that PERL became liable for the P&A Obligations did not relieve the Previous Owners of their own liability.  The relevant regulations also gave (and continue to give) the Department of the Interior recourse against any prior record title owner of the Beta Assets for fulfillment of abandonment obligations.  Thus, the Previous Owners remained jointly and severally liable for fulfilling decommissioning obligations. *See* 30 C.F.R. § 556.604(e).

26.     As part of the Original Beta Sale, the Previous Owners required financial assurance from PERL that it would satisfy the P&A Obligations, and that it would secure the Previous Owners' own decommissioning obligations in the event the Department of the Interior were to hold them liable.

27.     There were various ways that PERL could have provided security to the Previous Owners.  One alternative would have been for PERL to provide two separate security vehicles: one to the Previous Owners, and another to the Department of the Interior/MMS.  This option, however, would have required PERL to incur the costs of maintaining double security.

28.     Another alternative was for PERL to provide a form of security to MMS that also provided the Previous Owners with subordinate interests in the same security, and thus avoid double bonding.  PERL and the Previous Owners agreed that the Previous Owners would accept a junior interest in whatever form of security MMS would agree to, provided that (i) Aera would receive additional security to the extent MMS' security was less than $90 million, and (ii) Aera and Noble would have the right to approve the form of any letter of credit provided to MMS, but not any other forms of security that were provided (including any U.S. Treasury notes or performance bonds).

### B.     THE AERA, NOBLE, AND SWEPI PURCHASE AND SALE AGREEMENTS

29.     Aera and PERL entered into the Amended and Restated Purchase and Sale Agreement dated November 1, 2006 ("Aera/PERL PSA").[3]  Pursuant to this agreement, PERL agreed to assume the P&A Obligations, *id.* § 11.09(a), and that it would "pay all costs and expenses associated with the obligations" it had assumed, *id.* § 11.09(b).

30.     PERL also agreed to provide security in the amount of $90 million for the benefit of Aera ("Aera Bond") in the form of:

> (i) … a letter of credit, in form and substance satisfactory to Aera, a cash deposit or U.S. Treasury notes; (ii) … an escrow account at a federally insured national financial institution; or (iii) … a performance bond or other financial security substantially in the form [attached to the Aera PSA] and executed and acknowledged by Buyer and an institution acceptable to Aera, in each case … in the amount of Ninety Million and No Hundredths Dollars ($90,000,000.00) ("**Security Amount**") to guarantee Buyer's performance and payment of the Abandonment Obligations (any of the foregoing types of security described in clauses (i), (ii), or (iii), in an amount equal to the Security Amount, the "**Aera Bond**").

---

[3]     A copy of the Aera/PERL PSA was attached as Exhibit A to Aera's confirmation objection [Docket No. 293] ("Aera Objection").

Aera/PERL PSA § 11.09(b) (bolding in original).  Thus, the Aera/PERL PSA permitted

PERL to provide a variety of forms of security to Aera, including performance bonds.

31.    PERL generally was required to maintain the Aera Bond until the earlier of

when (i) all P&A Obligations had been completely performed and satisfied or

(ii) expenditures were fully credited against the penal sum of the Aera Bond.  Aera/PERL

PSA § 11.09(b).  However, *PERL could reduce the amount of the Aera Bond—or*

*eliminate it entirely—if PERL provided any bonds or other security to MMS*:

> If Buyer is required by the MMS to post one or more performance bonds, a letter
> of credit, in form and substance satisfactory to Aera, a cash deposit, U.S. Treasury
> notes or other forms of financial security (including any supplemental bonds) with
> respect to all or a portion of the Abandonment Obligation (each such bond, a
> "**Governmental Bond**"), upon furnishing evidence to Aera that the Governmental
> Bond has been filed with and accepted by the MMS in accordance with Applicable
> Laws, Aera will authorize Buyer to reduce the Security Amount covered by the
> Aera Bond by the amount of the Governmental Bond that is attributable to the
> Assumed Share and will execute such instruments of authorization as may be
> necessary to accomplish such reduction.

Aera/PERL PSA § 11.09(c) (bolding in original).

32.    Thus, *the Aera/PERL PSA expressly permitted the Aera Bond to be fully*

*substituted by, among other things, U.S. Treasury notes and performance bonds required*

*by MMS.*  Moreover, the phrase "in form and substance satisfactory to Aera" only modified

letters of credit, and not performance bonds.  Thus, Treasury notes and performance bonds

were not required to be in form and substance satisfactory to Aera, as long as they were

acceptable to MMS.[4]

---

[4]    The Aera/PERL PSA also contemplated that the amount of the Governmental Bond
might be lowered by MMS, in which case the amount of the Aera Bond (which, again,

33.    The Aera/PERL PSA granted to Aera "a continuing security interest" subordinate to MMS "in each Governmental Bond and the proceeds thereof, and any substitute or replacement security given from time to time, to secure Buyer's payment and performance of the [P&A Obligations]." *Id*. § 11.09(h).[5]

34.    The agreements with SWEPI and Noble were consistent with the foregoing. Pursuant to the Purchase and Sale Agreement between PERL and SWEPI dated as of

---

could take various forms, including U.S. Treasury notes or performance bonds) might be reinstated or raised back up to $90 million:

> In the event that the amount of the Governmental Bond that is attributable to the Assumed Share is later lowered by the MMS or such bond is no longer required or otherwise lapses, Buyer shall restore, increase or deliver a replacement of the Aera Bond so that the total of the (x) the amount of the Governmental Bond attributable to the Assumed Share and (y) the amount of the Aera Bond never falls below Ninety Million and No Hundredths Dollars ($90,000,000).

Aera/PERL PSA § 11.09(c).

[5]    The Aera/PERL PSA provided:

> Buyer hereby grants to Aera a continuing security interest in each Governmental Bond and the proceeds thereof, and any substitute or replacement security given from time to time, to secure Buyer's payment and performance of the [P&A] Obligations.  Such security interest shall be senior to all other liens, security interests, pledges and other encumbrances other than the pledge by Buyer of the Governmental Bonds in favor of the MMS to secure payment and performance of the [P&A] Obligations, and Buyer shall not grant to any other Person (other than the MMS) a lien, security interest, pledge or encumbrance that is senior to the security interest held by Aera and shall cause any creditor of Buyer (other than the MMS) to execute and deliver to Aera an instrument subordinating any security interest in the Governmental Bond held by such creditor to the security interest granted to Aera.

Aera/PERL PSA § 11.09(h).

November 13, 2006 ("SWEPI/PERL PSA") and the Purchase and Sale Agreement between

PERL and Noble dated February 28, 2007 ("Noble/PERL PSA"), SWEPI and Noble agreed

to accept subordinate security interests in whatever Governmental Bond MMS accepted.

SWEPI/PERL PSA § 11.06;[6] Noble/PERL PSA § 9.06.[7]

35.     In sum, pursuant to the Aera/PERL PSA, the SWEPI/PERL PSA, and the

Noble/PERL PSA, the Previous Owners agreed to accept as security various vehicles,

including U.S. Treasury notes or performance bonds, in whatever form MMS agreed to,

provided, in Aera's case, the security totaled at least $90 million until the P&A Obligations

were satisfied or the bonds were drawn.  The Previous Owners also agreed that MMS'

interest in any security would be senior to their own.

36.     At the time of the Original Beta Sale, there was no type of performance

bond that was accepted by MMS that would allow multiple obligees.  However, MMS

---

[6]   The SWEPI/PERL PSA provided that PERL would assume the P&A Obligations
(§ 11.06(a)), and that PERL "shall post with the MMS one or more performance bonds,
a letter of credit, in form and substance satisfactory to Aera, a cash deposit, U.S.
Treasury notes or other forms of financial security (including any supplemental bonds)
to guarantee Buyer's performance and payment of all of the" P&A Obligations
(§ 11.06(b)).  It also granted to SWEPI a security interest in the security provided to
the MMS, junior to the interests of the MMS and Aera (§ 11.06(e)).

[7]   The Noble/PERL PSA provided that PERL would assume the P&A Obligations
(§ 9.06(a)), and that PERL "shall post with the MMS one or more performance bonds,
a letter of credit, in form and substance satisfactory to Noble, a cash deposit, U.S.
Treasury notes or other forms of financial security (including any supplemental bonds)
to guarantee Buyer's performance and payment of all of the" P&A Obligations
(§ 9.06(b)).  It also granted to Noble a "senior" security interest in the security provided
to the MMS, but made clear that PERL could grant a senior lien to the MMS (§ 9.06(e)),
which PERL did.

would accept a form of trust agreement that allowed subordinate security interests in the trust res.

37.     Therefore, because dual-obligee bonds were not then feasible, PERL, with the approval of MMS, agreed that it would provide MMS with a U.S. Treasury note in the amount of $90 million ("Original Treasury Note"), with a subordinate security interest in the Original Treasury Note granted to the Previous Owners.  This satisfied not only PERL's obligations to MMS, but also PERL's obligations under the Aera, SWEPI, and Noble PSAs; no second independent security was needed.  The Original Treasury Note was then placed into the Beta Trust.

### C.     THE BETA TRUST AGREEMENT

38.     The Beta Trust is governed by the Supplemental Bond For Decommissioning Liabilities Trust Agreement, effective as of March 1, 2007 ("Beta Trust Agreement",[8] and with the Beta Trust Amendment (as defined below) the "Amended Beta Trust Agreement").  The Beta Trust Agreement is between PERL as Settlor, U.S. Bank National Association, as Trustee ("U.S. Bank") and MMS (now BOEM) as Beneficiary.

39.     The Beta Trust Agreement specifies that PERL deliver to the Beta Trust the Original Treasury Note in the amount of $90 million, which, with the reinvestment of the earnings and/or addition of capital if needed, would be equal to $126.7 million by March 31, 2014, "which is deemed by the Beneficiary as sufficient to serve as security for the [P&A Obligations]" and is defined as "the Supplemental Bond Treasury Note."  Beta Trust Agreement, Preamble.

---

[8]     A copy of the Beta Trust Agreement was attached to Aera Objection as Exhibit B.

40.    The declaration of trust in the Beta Trust Agreement declares that all funds are to be held "on behalf of the Beneficiary and for the use and benefit of [BOEM] pursuant to the terms of this Agreement."  Beta Trust Agreement § 2.4(a).

41.    There is no mention of the Previous Owners in the declaration of trust.  The Previous Owners are not party to the Beta Trust Agreement.  The Beta Trust Agreement states only that Aera and SWEPI are intended third party beneficiaries and that "Settlor has granted [subordinate] security interests in the Supplemental Bond Treasury Note to Aera … and to SWEPI … in each case to secure payment and performance of the [P&A Obligations]."  Beta Trust Agreement §§ 2.6(c), 5.3.

42.    The Previous Owners are not entitled to any distribution of funds from the Beta Trust under the Beta Trust Agreement.  Rather, upon fulfillment of the P&A Obligations, the trust is to terminate, in which case "the Trustee shall transfer the Trust Funds as directed by the Settlor …."  Beta Trust Agreement § 5.11.  Should PERL fail to fulfill the P&A Obligations, or upon the occurrence of any other event of default as defined in the Beta Trust Agreement, MMS may direct the Trustee to transfer all or a portion of the funds to MMS.  *Id.* § 4.4(d).  There is no provision for transfer of any monies to the Previous Owners.

43.    The right to direct the Trustee without PERL's consent was reserved to MMS.  Aera and SWEPI could direct only with MMS's consent.  Beta Trust Agreement § 2.4(a) (Trustee agrees to "comply with all orders and direction from the Beneficiary [MMS] and [Aera and SWEPI] without further consent from Settlor; provided that the Trustee shall not comply with any order or directions from [Aera and SWEPI] unless the Beneficiary [MMS] consents thereto.").

44.     The Beta Trust Agreement is governed by California law (*Id.* § 5.12) and does *not* provide for irrevocability.  Therefore, pursuant to the California Probate Code, the Beta Trust is a revocable trust because "[u]nless a trust is expressly made irrevocable by the trust instrument, the trust is revocable by the settlor."  Cal. Prob. Code § 15400. Because the Beta Trust is revocable, its assets are property of the Debtors' bankruptcy estate.  *See, e.g.*, *U.S. v. Washington*, 2011 U.S. Dist. LEXIS 99876, at *35 (S.D. Tex. Sept. 6, 2011) ("if a debtor places assets in a revocable trust and hence retains the right to revoke the trust, the assets are considered property of the estate").

### D.     RISE ACQUIRES THE BETA ASSETS FROM PERL

45.     PERL filed a chapter 11 petition in the United States Bankruptcy Court for the District of Delaware on March 8, 2009 (Case No. 09-10785, "PERL Bankruptcy").

46.     PERL filed a motion in the PERL Bankruptcy to sell the Beta Assets on July 2, 2009 [Docket No. 550], to which Aera and Noble objected.  The objections were resolved pursuant to a Settlement Agreement effective as of December 30, 2009 ("Settlement Agreement").[9]  The Bankruptcy Court in Delaware approved the sale in an order entered December 23, 2009, and PERL consummated its sale of the Beta Assets to Rise (now Beta)[10] pursuant to a purchase and sale agreement dated as of December 15,

---

[9]     A copy of the Settlement Agreement was attached to Aera Objection as Exhibit C.

[10]    The "Buyers" as defined in the relevant purchase agreement were Rise and SP Beta Properties, LLC; SP Beta Properties, LLC sold its interests to Rise in 2015 and then merged with and into Rise.

2009.[11]  An Amendment to Beta Trust Agreement, effective as of May 14, 2010 ("Beta Trust Amendment"[12]) was also executed.

1.      **Key Provisions Of The Settlement Agreement**

47.     Pursuant to the Settlement Agreement, Rise "agreed, for the Benefit of the Previous Owners, to be obligated with respect to certain covenants pertaining to matters described in the Aera PSA, the Noble PSA, and the SWEPI PSA, but only on the terms and subject to the conditions set forth herein."  Settlement Agreement, Recitals § F.

48.     Rise agreed that the Previous Owners would retain, and Rise would not impair "all existing rights and security interests the Previous Owners possess with respect to the MMS Trust Agreement and each other Governmental Bond and proceeds thereof that secure PERL's payment and performance of the [P&A Obligations]."  *Id.* § 3.2(b).  At this time, the only existing Governmental Bond securing PERL's P&A Obligations was the Original Treasury Note that was held in the Beta Trust.

49.     Further, the parties reconfirmed their understanding that, as set forth in the Aera/PERL PSA, Aera would be entitled to an Aera Bond in the amount of $90 million, but that such Aera Bond could and would be reduced by the posting of any Governmental Bond.  *Id.* § 3.2(c).

50.     Notably, the Previous Owners, once again, specifically acknowledged that the Governmental Bond might be reduced to less than $90 million, and agreed in that case

---

[11]   A copy of the purchase and sale agreement was attached to Aera Objection as Exhibit D.

[12]   A copy of the Beta Trust Amendment was attached to Aera Objection as Exhibit E.

to accept an increase in the Aera Bond in any of a variety of forms, including U.S. Treasury

notes or a performance bond:

> ***If at any time*** after the earlier to occur of (x) the date when the MMS requires that the amount of the Governmental Bond be increased, or (y) September 30, 2013***, the amount of the Governmental Bond should be less than $90,000,000, Buyers and Successor Operator shall*** (i) deliver to Aera, for the benefit of the Previous Owners and maintain thereafter a letter of credit, in form and substance satisfactory to Aera, a cash deposit or U.S. Treasury notes; (ii) establish an escrow account at the federally-insured national financial institution; or (iii***) obtain and deliver to Aera, for the benefit of the Previous Owners, a performance bond or other financial security substantially in the [same] form*** …in the amount of the remainder of $90,000,000 minus the amount of the Governmental Bond to guarantee [Rise's] performance and payment of the [P&A Obligations] (any of the foregoing types of security described in clauses (i), (ii) or (ii), in the amount described, the "Aera Bond"). * * *

*Id*. § 3.2(c) (emphasis added).

51.     Thus, the Previous Owners acknowledged that a reduction in the

Governmental Bond was possible, and confirmed—once again—that U.S. Treasury notes

or surety bonds would provide equivalent security.  Moreover, the provisions in the 2006

Aera, Noble, and SWEPI PSAs that permitted the Governmental Bond to be in the form of

U.S. Treasury notes or a performance bond were not amended.

### 2.     Key Provisions Of The Beta Trust Amendment

52.     The Beta Trust Amendment is between the Department of the Interior as

Beneficiary, U.S. Bank, and Plaintiff as Successor Settlors.  Beta Trust Amendment § 1.1.

53.     None of the Previous Owners are a party to the Beta Trust Amendment.  The

Beta Trust Amendment does not make the Previous Owners direct beneficiaries of the Beta

Trust.  Aera and SWEPI remained third party beneficiaries.  Noble, which was not

previously mentioned in the Beta Trust Agreement, was added as a notice party.

54.     The Beta Trust Amendment notes that based on accrual of interest on the $90 million Original Treasury Note, the total balance of the trust account was equal to $99,073,882.31 as of April 31, 2010.  *Id*., Preamble.

55.     The Beta Trust Amendment sets forth the estimated Beta abandonment liability as $152 million, and requires that the balance of the trust account be increased to $152 million by December 31, 2016, although the Beta Trust Amendment does not specify the vehicle by which the trust res is to be increased.  Beta Trust Amendment § 2.2 (a)-(b).

56.     Plaintiff has made the required additional $62 million of deposits ("Additional Cash Collateral"), in cash, to the Beta Trust res.

**E.     THE PREVIOUS OWNERS BLOCK BOEM'S ATTEMPT TO REPLACE THE ADDITIONAL CASH COLLATERAL WITH SURETY BONDS**

57.     The Previous Owners began to breach their prior agreements no later than 2016.  BOEM and the Debtors reached agreement that the $62 million in Additional Cash Collateral could be replaced with an equal amount of surety bonds.  On April 7, 2016, Rise submitted to BOEM surety bonds issued by Argo and Aspen American Insurance Company ("Aspen")[13] in the aggregate amount of $62 million.  BOEM formally acknowledged and accepted these bonds on April 15, 2016 (the "April 2016 Agreement").  On May 3, 2016, BOEM instructed the Trustee to release the Additional Cash Collateral from the Beta Trust account.

---

[13]   Aspen is an A.M. Best Ratings Services rated A (Excellent) surety company.  *See* A.M. Best Rating Services Rating for Aspen American Insurance Company, *available at* http://www3.ambest.com/ratings/entities/CompanyProfile.aspx?ambnum=14149&URatingId=1506447&AltNum=0.

58.     A direction by BOEM to replace the Additional Cash Collateral with surety bonds accepted by BOEM should have been non-controversial to the Previous Owners. After all, pursuant to the Aera, Noble, and SWEPI PSAs, the Previous Owners repeatedly agreed that both the Aera Bond and any Governmental Bond could be in the form of surety bonds.  Moreover, this was collateral over and above the $90 million amount bargained for in the original Aera Bond.

59.     However, U.S. Bank unnecessarily requested the Previous Owners' consent to BOEM's direction, notwithstanding the fact that Section 2.4(a) of the Beta Trust Agreement is clear on its face that BOEM's directions require no consent.   While a direction from Aera or SWEPI requires BOEM's consent, Aera and SWEPI do not have a reciprocal right to consent to (or veto) directions issued by BOEM.

60.     The Previous Owners unlawfully refused to consent to BOEM's direction to the Trustee, obstructing and blocking consummation of the April 2016 Agreement, even when Rise offered to name them as co-obligees on the Argo/Aspen bonds.  The Trustee did not release the Additional Cash Collateral.

**F.     THE PREVIOUS OWNERS' ATTEMPT TO BLOCK CONFIRMATION OF THE PLAN AS TO THEIR CLASS 3B CLAIMS**

61.     The Previous Owners were undaunted by the commencement of the Debtors' bankruptcy cases and the imposition of the automatic stay.  The Previous Owners did not retract their position vis-à-vis U.S. Bank with regard to security for which they are not the primary beneficiaries and for which they did not bargain.

62.     Pursuant to the Plan, the Debtors propose to substitute the totality of the Beta Trust res with the Proposed Beta Security, including $62 million in Proposed Beta

Surety Bonds, which will be dual-obligee bonds issued by Argo, an A.M. Best A XIII rated surety, or by a similarly-rated surety and U.S. Treasury notes.

63.     Dual-obligee surety bonds, which were not available for use by the Department of the Interior at the time that the Beta Trust was created, are now a form of security accepted by BOEM that allows the principal party to provide surety in favor of multiple obligees.  The Beta Surety Bonds fulfill both BOEM's requirements and the Aera Bond requirements in one vehicle.  Indeed, had dual-obligee surety bonds been feasible at the time that the Aera, SWEPI, and Noble PSAs were executed, the Beta Trust would never have been established.

64.     In contrast to when the Beta Trust was originally established, BOEM is now accepting dual obligee bonding arrangements to protect both the government and predecessor owners.  *See, e.g.*, BOEM, An Update On Requiring Additional Security (March 14, 2017) at 8 ("BOEM will work with lessees on solutions to reduce 'Redundant Bonding' through mechanisms such as 'Multi Party' bonds.");[14] BOEM Offshore Financial Security Workshop (August 10, 2016) at 17 (Multi party bonds included among "[t]ypes of financial assurance permitted through the discretion vested in the Regional Director");[15] BOEM 2015 Houston Offshore Financial Assurance Forum, Questions and Answers from

---

[14]   An Update on Requiring Additional Security, Bureau of Ocean Energy Management, dated March 14, 2017, *available at* https://www.boem.gov/2017-03-14-An-Update-Requiring-Additional-Information-DecomWorld-Celata/.

[15]   Offshore Financial Security Workshop, Bureau of Ocean Energy Management, dated August 10, 2016, *available at* https://www.boem.gov/HOUSTON-WORKSHOP/.

the Houston Forum at 3 (recognizing that a dual obligee bond "will protect the government if it's a co-obligee bond and it would protect the predecessor …").[16]

65. It is now standard industry practice to provide surety bonds to meet BOEM's bonding requirements and to secure against contingent liability from failure to fulfill plugging and abandonment liabilities.  In fact, on information and belief, the very same mega oil and gas companies that own the Previous Owners have used such performance bonds to provide security for both Federal and California state regulators.

66. Further, the Previous Owners' agreements with Rise and its predecessors make clear that surety bonds may be used to secure the P&A Obligations.  The Aera, Noble, and SWEPI PSAs contemplate surety bonds as an acceptable form of security to be posted to the Previous Owners and BOEM.  Similarly, the 2009 Settlement Agreement between Rise and the Previous Owners, executed several years after the Beta Trust Agreement, specifically contemplates that the Supplemental Bond Treasury Note might be reduced, and approves replacement of it with performance bonds.

67. Thus, the Previous Owners' prior agreements reflect their belief that surety bonds are equivalent collateral to the U.S. Treasury securities and cash that have been used to fund the Beta Trust.

68. Argo is a highly rated surety and is included in the U.S. Department of Treasury's Bureau of the Fiscal Service Circular 570 list, which lists companies legally capable of issuing compliant bonds.  Effective as of November 11, 2016, A.M. Best Rating

---

[16]   2015 Houston Offshore Financial Assurance Forum, *Questions and Answers from the Houston Forum*, dated October 2015, *available at* https://www.boem.gov/2015-Houston-Offshore-Financial-Assurance-Forum-Q-and-A/.

Services gave Argo an A (Excellent) rating in Financial Size Category XIII ($1.25 billion to $1.5 billion) with a stable outlook, as well as a long-term issuer credit rating of A with a stable outlook.  Ratings of "Excellent," such as that received by Argo, are "assigned to insurance companies that have … an excellent ability to meet their ongoing insurance obligations.[17]  In addition, Argo has an S&P rating of A-.

69.    On and prior to July 20, 2017, the Debtors presented their plan to implement the Proposed Beta Security to BOEM and the Department of the Interior.  Consistent with the April 2016 Agreement, once again, BOEM did not object to the Debtors' construct and confirmed that the Debtors' proposal was consistent and compliant with the governing federal regulations.

70.    Nevertheless, the Previous Owners refuse to consent to a transaction that will leave them in the same, if not better, position than that which they bargained for and currently occupy.

71.    Debtors therefore bring this action asking that the Court approve the Plan's treatment as to the Previous Owners' Class 3B claims, as well as for related relief.

---

[17]  *See* A.M. Best Rating Services Rating for Argonaut Insurance Company, *available at* http://www3.ambest.com/ratings/entities/CompanyProfile.aspx?ambnum=2056&URatingId=1506447&bl=0&AltSrc=1&PPP=&AltNum=0&Ext_User=&Ext_Misc=&Portal=0&Site=.

## FIRST CLAIM FOR RELIEF

### Declaration That The Res Of The Beta Trust Is Property Of The Estate Pursuant to 11 U.S.C. § 541

72.     Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs 1-71.

73.     The Previous Owners, in the Aera Objection, have objected to this Court's jurisdiction over the Beta Trust on the basis that the Beta Trust is irrevocable, and that its res therefore is not property of Debtors' bankruptcy estate.

74.     A controversy exists because Plaintiff maintains that the res of the Beta Trust is property of Debtors' bankruptcy estate.

75.     Nothing in the Beta Trust Agreement provides that it is irrevocable. Pursuant to Cal. Prob. Code § 15400, any trust that is not made expressly irrevocable is revocable.

76.     Pursuant to case law in this Circuit and others, the res of a revocable trust is property of the bankruptcy estate.  *See, e.g.*, *Askanase v. LivingWell, Inc.,* 45 F.3d 103, 106 (5th Cir.1995); *U.S. v. Washington*, *supra*.  Accordingly, the res of the Beta Trust is property of the Debtors' bankruptcy estate.

77.     Alternatively, even if the Beta Trust is not revocable, its res constitutes property of the Debtors' estate because (i) its purpose and effect was and remains to collateralize the Debtors' P&A Obligations, (ii) it was funded by the Debtors solely with their own property, and (iii) upon the satisfaction of the P&A Obligations, all remaining funds in the Beta Trust will be returned to the Debtors.  Accordingly, the Beta Trust should

be treated as collateral of the Debtors securing obligations to Department of the Interior and the Previous Owners.

78.     Therefore, Plaintiff requests a determination that the res of Beta Trust is property of the Debtors' bankruptcy estate pursuant to Bankruptcy Code section 541.

## SECOND CLAIM FOR RELIEF

### Declaration That The Previous Owners Do Not Have Right To Veto BOEM's Direction To The Beta Trustee

79.     Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs 1-78.

80.     Although BOEM has accepted surety bonds as substitute collateral for the Additional Cash Collateral and has issued an instruction to U.S. Bank to release the Additional Cash Collateral, U.S. Bank unnecessarily requested consent to this direction from the Previous Owners.

81.     The Previous Owners have not given consent, nor have they advised U.S. Bank that the Previous Owners' consent is not required when BOEM gives direction.

82.     A controversy exists because Plaintiff believes the Amended Beta Trust Agreement does not require the Previous Owners' consent to a direction given by BOEM, pursuant to Section 2.4(a) of the Beta Trust Agreement.

83.     Moreover, pursuant to Bankruptcy Code section 1142(b), the Court may direct the debtor or any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, including the satisfaction of any lien, that is necessary for the consummation of the plan.  Thus, to the extent the Previous

Owners' consent is required, this Court is authorized to direct the Previous Owners to provide such consent upon approval of the Plan's treatment of the Previous Owners' claims.

84.     Therefore, Plaintiff requests (i) a determination that the Previous Owners have no right under the Amended Beta Trust Agreement to veto a direction given by BOEM with respect to the disposition of the res of the Beta Trust, and (ii) a direction to the Previous Owners pursuant to Bankruptcy Code section 1142(b) ordering the Previous Owners to consent to any direction by BOEM to withdraw the Beta Trust res.

**THIRD CLAIM FOR RELIEF**

**Declaration That Class 3B Claim Holders Are Unimpaired Pursuant To Bankruptcy Code Section 1124**

85.     Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs 1-84.

86.     Pursuant to the Plan, Plaintiff proposes to replace the current Beta Trust res with the Proposed Beta Security (including the Proposed Beta Surety Bonds), which will be U.S. Treasury notes and dual-obligee surety bonds accepted by BOEM, compliant with governing federal regulations, and issued by a highly-rated surety such as Argo.  The Previous Owners will be obligees on the Proposed Beta Surety Bonds, with a position subordinate to BOEM.

87.     Pursuant to the Aera, Noble, and SWEPI PSAs and the Settlement Agreement, the Previous Owners bargained for the right to receive either: (i) a $90 million Aera Bond, to be provided in one of several types of security, including performance bonds such as the Proposed Beta Surety Bonds; or (ii) subordinate security interests in whatever

type of security, including performance bonds such as the Proposed Beta Surety Bonds, that BOEM choses to accept.  The foregoing agreements also anticipated that the amount and type of security accepted by BOEM might change over time, and the agreements do not include any prohibition against the same, provided that the amount of security does not decline below $90 million before the P&A Obligations are fully satisfied.

88.     Thus, the Previous Owners' interest in the Beta Trust res is governed by the grant of rights in the Aera, Noble, and SWEPI PSAs and Settlement Agreement, and these contracts themselves anticipate and allow security in various types, including performance bonds, and further allow the substitution of the same.

89.     Bankruptcy Code section 1124 provides that a claim is not impaired if a plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest."  Because substitution of the Beta Trust res with the Proposed Beta Surety Bonds and other Proposed Beta Security (*i.e.*, U.S. Treasury notes) was bargained for and is permissible under the relevant contracts, such substitution under the Plan would not impair the holders of Class 3B claims.

90.     Therefore, Plaintiff requests a determination that substitution of the Beta Trust res with the Proposed Beta Surety Bonds will not impair holders of Class 3B claims, pursuant to Bankruptcy Code section 1124.

### FOURTH CLAIM FOR RELIEF

**Approval Of The Plan's Treatment As To Class 3B Claims Pursuant To 11 U.S.C. § 1129(a)(8)(B) Or, Alternatively, 11 U.S.C. §§ 1129(b)(1) & (2)(A)**

91.     Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs 1-90.

92.     Pursuant to the Plan, Plaintiff proposes to replace the current Beta Trust res with the Proposed Beta Security, which will be U.S. Treasury notes and dual-obligee surety bonds accepted by BOEM and issued by a highly-rated surety such as Argo.  The Previous Owners will be obligees on the Proposed Beta Surety Bonds, with a position subordinate to BOEM.

93.     The Previous Owners have objected to the Plan.

94.     The Previous Owners' claims are not impaired under the Plan.  Accordingly, the Plan may be confirmed under Bankruptcy Code section 1129(a)(8)(B).

95.     Alternatively, even if the Previous Owners' claims are impaired, the Plan could be and was confirmed under Bankruptcy Code section 1129(b).

96.     The Previous Owners' claims are unique from the claims of any other of Debtors' creditors, and no other creditors with similar legal rights are receiving materially different treatment under the Plan.  Further, the Previous Owners' Class 3B claims are unliquidated contingent claims for reimbursement or contribution by an entity that is co-liable with Debtors, and thus subject to disallowance under Bankruptcy Code section 502(e) (*see* Fifth Claim For Relief).

97.     Under the Plan, the Previous Owners will receive the benefit for which they bargained—a junior interest in U.S. Treasury notes and a performance bond granted to BOEM.  Performance bonds are generally accepted in the industry, and the Proposed Beta Surety Bonds will be issued by Argo or a similarly highly-rated surety.  The Proposed Beta Surety Bonds and other Proposed Beta Security is compliant with governing federal regulations and is acceptable to BOEM, which has a strong legal and economic interest in ensuring that the bonds are sufficient.  The Proposed Beta Security will cover the full

amount of the Previous Owners' allowed claims for P&A Obligations, and will be in the same amount as the current res of the Beta Trust.

98.     Accordingly, the Plan does not unfairly discriminate against, and is fair and equitable with respect to, Class 3B claims, as required by Bankruptcy Code section 1129(b)(1).  Moreover, by replacing the Beta Trust res with the Proposed Beta Security, Plaintiff is providing a "substitute of the most indubitable equivalent"—indeed a substitute that Previous Owners specifically bargained for and agreed to—pursuant to Bankruptcy Code section 1129(b)(2)(A).

99.     Therefore, Plaintiff requests an order approving the Plan's treatment as to Class 3B claims pursuant to Bankruptcy Code section 1129(a)(8)(B) or, alternatively, sections 1129(b)(1) & (2)(A).

### FIFTH CLAIM FOR RELIEF

### Disallowance Of Contingent Claims Pursuant To 11 U.S.C. § 502(e)

100.     Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs 1-99.

101.     Bankruptcy Code section 502(e) provides, in relevant part, that:

…the court shall disallow any claim for reimbursement or contribution of any entity that is liable with the debtor on or has secured the claim of a creditor, to the extent that—

*** 

such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution; …

102.     Any claims held by the Previous Owners are subject to disallowance under Bankruptcy Code section 502(e) because they are contingent claims for reimbursement or contribution by entities that are co-liable with Debtors.

103.     The Previous Owners' Class 3B claims arise from the Previous Owners' co-liability with Rise to BOEM, pursuant to applicable regulations.

104.     Further, any claim by a Class 3B holder is currently contingent, because such claims would mature and become liquidated only in the event that: (i) the P&A Obligations ripen; (ii) Rise fails to fulfill the P&A Obligations; and (iii) BOEM seeks to enforce liability against the Previous Owners as a result of Rise's failure to fulfill the P&A Obligations.   At present, the Previous Owners have no matured, non-contingent, or liquidated claims against Plaintiff.

105.     Therefore, Plaintiff requests an order disallowing the Class 3B claims of the Previous Owners as contingent claims for reimbursement or contribution pursuant to Bankruptcy Code section 502(e).

106.     Plaintiff acknowledges that, to the extent the Previous Owners' claims are secured, the disallowance of such claims pursuant to Bankruptcy Code section 502(e) does not, in itself, result in a stripping of their present liens under Bankruptcy Code section 506(d).  *See In re Tri-Union Development Corp.*, 314 B.R. 611 (Bankr. S.D. Tex. 2004). Accordingly, to the extent the Previous Owners have properly secured their interests, the Previous Owners have nonrecourse, contingent claims secured by the res of the Beta Trust. *See* Bankruptcy Code section 102(2) ("'claim against the debtor' includes claim against property of the debtor").   However, the Previous Owners' claims and liens are subject to modification under, *inter alia*, Bankruptcy Code sections 1123(a)(5) ("satisfaction or

modification of any lien"), 1123(b)(5) (modification of the rights of holders of secured claims), and 1129(b) (cram down of secured classes under a plan).

107.     Plaintiff requests an order limiting the amount of any claim or other interest of the Previous Owners under Bankruptcy Code section 506(d) to the res of the Beta Trust, or any indubitable equivalent or contractually permissible substitute thereof, which claim or interest may be modified in accordance with Bankruptcy Code sections 1123 and 1129.

## SIXTH CLAIM FOR RELIEF

### Limitation Of Postpetition Lien Pursuant To 11 U.S.C. § 552(a)

108.     Plaintiff repeats and re-alleges each and every allegation contained in the preceding paragraphs 1-107.

109.     Bankruptcy Code section 552(a) provides:

> Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

110.     Accordingly, the Previous Owners are not entitled to any collateral in excess of the current res of the Beta Trust, the proceeds thereof, or any indubitable equivalent or contractually permissible substitute thereof (which indubitable equivalent and contractually permissible substitute includes the Proposed Beta Security).

111.     Per applicable regulations, Plaintiff from time to time may be required to provide additional security for BOEM in the future, including but not limited to additional collateral or bonds.

112.     Plaintiff requests an order that, to the extent that Plaintiff provides additional security to BOEM in excess of the res of the Beta Trust or its indubitable equivalent (including the Proposed Beta Surety Bonds and the other Proposed Beta

Security), the Previous Owners shall have no claim against or interest in such additional security in accordance with Bankruptcy Code section 552(a).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in favor of Plaintiff:

A.    Determining that the res of the Beta Trust is property of the Debtors' bankruptcy estate pursuant to Bankruptcy Code section 541;

B.    (i) Determining that the Previous Owners have no right to veto a direction given by BOEM with respect to the res of the Beta Trust; and

(ii) Directing the Previous Owners consent to any direction by BOEM to withdraw the Beta Trust res, pursuant to Bankruptcy Code section 1142(b) and the terms of the Amended Beta Trust Agreement;

C.    Determining that the proposed treatment of the Class 3B claims provided for herein as well as under the Plan constitutes unimpairment pursuant to Bankruptcy Code section 1124;

D.    Approving the Plan's treatment as to Class 3B claims either because the Plan will not impair the Class 3B claims pursuant to Bankruptcy Code section 1129(a)(8)(B) or, in the alternative, pursuant to Bankruptcy Code sections 1129(b)(1) & (2)(A);

E.    Disallowing the Class 3B claims as contingent claims for reimbursement or contribution pursuant to Bankruptcy Code section 502(e), and limiting the amount of any claim or other interest of the Previous Owners under

Bankruptcy Code section 506(d) to the res of the Beta Trust, or any indubitable equivalent or contractually permissible substitute thereof;

F.      Directing that the Previous Owners shall have no claim against or any interest in any additional security provided by Plaintiff to the Department of the Interior in excess of the res of the Beta Trust, or in excess of its indubitable equivalent or contractually permissible substitute (which indubitable equivalent or contractually permissible substitute includes the Proposed Beta Surety Bonds and other Proposed Beta Security), in accordance with Bankruptcy Code section 552(a); and

G.      Any other relief the Court deems just and proper.

Dated:  Houston, Texas
       August 10, 2017

**QUINN EMANUEL URQUHART
& SULLIVAN, LLP**

Philippe Selendy (admitted pro hac vice)
Benjamin I. Finestone (admitted pro hac vice)
Rachel E. Epstein (admitted pro hac vice)
51 Madison Avenue
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

K. John Shaffer (admitted pro hac vice)
Matthew R. Scheck
865 South Figueroa St., 10th Floor
Los Angeles, California 90067
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

*/s/ Emily Smith*
Emily Smith
Texas Bar No. 24083876
711 Louisiana Street, Suite 500
Houston, Texas 77002
Telephone: (713) 221-7000
Facsimile: (713) 221-7100

-and-

**WEIL, GOTSHAL & MANGES LLP**

Alfredo R. Pérez
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

*Counsel for Debtors*