## IN THE UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| *In re*: | § | Chapter 11 |
| | § | |
| MEMORIAL PRODUCTION PARTNERS | § | Case No.: 17-30262 |
| LP, *et al*., | § | |
| | § | (Jointly Administered) |
| Debtors | § | |
| | § | |
| ---------------------------------------------------- | § | |
| | § | |
| BETA OPERATING COMPANY, LLC, | § | Adversary Proceeding: 17-03365 |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| AERA ENERGY, LLC, NOBLE ENERGY | § | |
| INC. and SWEPI LP, | § | |
| | § | |
| Defendants | § | |
| | § | |

## DEFENDANTS' MOTION TO DISMISS THE COMPLAINT
## PURSUANT TO FED. R. CIV. P. 12(b)(6)[1]

Aera Energy LLC ("**Aera**"), Noble Energy, Inc. ("**Noble**") and SWEPI LP ("**SWEPI**"

and collectively with Aera and Noble, the "**Previous Owners**"), as parties-in-interest to Debtors'

cases with full reservation of all of their rights,[2] through their undersigned counsel, hereby file

---

[1] The Previous Owners assert arguments for relief under Fed. R. Civ. P. 12(b)(1), (6) and (7) and also argue that reference of the Complaint must be withdrawn. For convenience of the Court, this pleading contains only the Fed. R. Civ. P. 12(b)(6) arguments. Only to the extent necessary to satisfy requirements concerning the order of pleadings, the Previous Owners incorporate by reference as if set forth in full herein their concurrently filed legal arguments set forth in the Previous Owners' motion to dismiss under Fed. R. Civ. P. 12(b)(1) and (7) or to withdraw reference of the complaint. It is intended that the two pleadings be treated as concurrently filed pleadings.

[2] The Previous Owners have not filed proofs of claim in the Debtors' cases nor are they creditors of the Debtors' estates. They appear before this Court in their capacities as parties-in-interest solely in regard to protecting their separate property interest in and to the funds that have been placed in the Beta Trust, which are also not property of the Debtors' estates. The Previous Owners respectfully state they do not consent to this Court's exercise of jurisdiction, in the Debtors' bankruptcy proceedings, over the Previous Owners' separate property interests or the claims against them. At all times, the Previous Owners intend to preserve their rights in this regard.

this motion to dismiss the adversary complaint [Adv. D.I. 1][3] (the "**Complaint**")[4] filed against them by Beta Operating Company, LLC, on its own behalf and as the reorganized, successor-in-interest to Debtor Rise Energy Beta, LLC ("**BOC**")[5] and, in support thereof, respectfully state as follows:

## I.    PRELIMINARY STATEMENT

1.    BOC seeks to invade the *res* of the Beta Trust, which was established in 2007 to ensure that there would be sufficient funding for the abandonment, restoration and remediation of the Beta Assets (*i.e.*, offshore oil and gas leases on which platforms and subsea wells are located in the Beta field off the coast of California) at the appropriate time (collectively, the "**Beta P&A Obligations**").  As an initial matter, BOC's claims must be dismissed because BOC already has compromised and released the Previous Owners from its claims, and covenanted not to sue on them, in the 2009 agreements by which BOC acquired the Beta Assets.  However, even if BOC's claims were not extinguished by these provisions, those claims independently fail because:

- the *res* of the Beta Trust, namely cash and cash equivalents securing performance of the Beta P&A Obligations, is not property of BOC's estate;

---

[3] References herein to "Adv. D.I." shall be to docket entries for this adversary proceeding and references herein to "Bankr. D.I." shall be to docket entries for Debtors' primary bankruptcy case.

[4] Capitalized terms used, but not defined herein, shall have the meaning ascribed to them in the Complaint or the Debtors' approved Plan (as defined herein), as the context requires.

[5] The Debtor entities that acquired the Beta Assets in 2009 from Pacific Energy Resources, Ltd. ("**PERL**") through a Section 363 sale in PERL's Delaware bankruptcy case (*In re Pacific Energy Resources Ltd., et. al.*, Ch. 11 Case No. 09-10785 (KJC) (Bankr. D. Del. 2009) (the "**PERL Bankruptcy Case**") were SP Beta Properties, LLC (sometimes referred to as Silver Point) and Rise Energy Beta, LLC.  Shortly thereafter, SP Beta Properties, LLC/Silver Point merged with and into Rise Energy Beta, LLC, which became the successor to both entities and ultimately a Debtor in these cases.  BOC is the successor-in-interest and reorganized entity that emerged from Debtor Rise Energy Beta, LLC.  *See* Disclosure Statement for Amended Joint Plan of Reorganization of Memorial Production Partners LP, et al. Under Chapter 11 of the Bankruptcy Code [Bankr. D.I. 246] ("**Disclosure Statement**"), at 11; Complaint, Introductory Paragraph and FN10 [Adv. D.I. 1].  Thus, BOC stands in the shoes of all of the Debtor entities that acquired the Beta Assets from PERL and is referred to as such herein.

- nothing in the governing agreements allows BOC to substitute other assets (including its proposed bonds) for the funds currently held in trust (the "**Beta Trust Funds**");

- nothing in the governing agreements allows BOC to amend the trust agreement or withdraw the trust funds without the express consent of the Previous Owners; and

- as a matter of law, BOC could not reject the trust agreement or other governing agreements (nor did it attempt to do so, as Debtors assumed all of their contracts in their entirety) in its recently filed bankruptcy case, and it also cannot revoke the underlying trust under applicable law.

As detailed further below, these facts – apparent from BOC's pleadings and the operative documents – doom its claims and compel dismissal of this action under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

2.     The Beta Trust was originally settled by PERL, BOC's predecessor-in-interest in the Beta Assets, pursuant to a March 1, 2007 "Supplemental Bond for Decommissioning Liabilities Trust Agreement (per 30 CFR 256.52)" (as defined by the Complaint, the "**Beta Trust Agreement**").  To settle the trust, PERL initially delivered to U.S. Bank National Association, as trustee (the "**Trustee**"), a U.S. Treasury Note in the amount of $90 million (the "**Treasury Note**").

3.     After PERL filed for bankruptcy in 2009, BOC agreed to acquire the Beta Assets pursuant to an order of the Delaware bankruptcy court.  Among other commitments it made in court documents, BOC agreed to continue to secure the Beta P&A Obligations by maintaining the Beta Trust in accordance with rules promulgated by the United States Government, acting by and through Minerals Management Service ("**MMS**"), the predecessor to the Bureau of Ocean

Energy Management ("**BOEM**").[6]  BOC also covenanted, as detailed below, to make quarterly *cash payments* into the trust to make sure that the Beta Trust Funds reached a certain threshold by 2016. As additional consideration to BOEM, BOC agreed to provide (but only if, and to the extent, required by BOEM) certain additional "Governmental Bonds," and as consideration to the Previous Owners, BOC agreed to provide (but only if, and to the extent, required by the Previous Owners when amounts in the Beta Trust and any additional Governmental Bonds fell below $90 million) additional security in the form of a so-called "Aera Bond."[7]

4.      In other words, following the 2009 transactions, the Beta Trust Funds – the Treasury Note, its proceeds and subsequent, regular cash contributions by BOC into the trust – were contemplated to be the principal, and continuing, security for payment of the Beta P&A Obligations.  While BOEM could have (at its discretion) required the posting of additional "Governmental Bonds," and the Previous Owners also could have required additional security – bonds posted directly for their benefit – if the principal amount of the Treasury Note and any other security posted to BOEM dropped below the initial dollar threshold, neither event ever occurred.

5.      BOC's entry into the Settlement Agreement and its commitment to remain bound by the Beta Trust Agreement, with certain amendments (as defined by the Complaint, the "**Amended Beta Trust Agreement**"), was approved by the Delaware bankruptcy court in the PERL Bankruptcy Case.  Notably, such agreement came following (i) Aera's objection (on behalf of the Previous Owners), in which it argued that PERL could not sell the Beta Assets

---

[6] *See* Settlement Agreement, § 3.2(b), which was incorporated into the Complaint, *see* Complaint at FN9.  A true and correct copy of that Settlement Agreement, as filed in the Real Property Records of Los Angeles County, is reattached hereto for the Court's convenience as **Exhibit E**.

[7] Under the agreements, the "Aera Bond" could take the form of (i) a performance bond (the form of which was attached to the settlement agreement); (ii) a letter of credit, cash deposit or U.S. Treasury Notes; or (iii) an escrow account at a federally insured national financial institution acceptable to Aera.  *See* Settlement Agreement, reattached hereto as Exhibit E, § 3.2(b).

4

without maintaining the full amount on deposit in the Beta Trust and otherwise keeping the Beta Trust intact and (ii) adversary proceedings filed by the Previous Owners to enforce certain rights under the agreements under which PERL had acquired the Beta Assets. *See* Aera Energy LLC v. Pacific Energy Resources Ltd., Adv. Case No. 09-51293 (KJC) (Bankr. D. Del 2009); Noble Energy, Inc. v. Pacific Energy Resources Ltd., Adv. Case No. 09-51009 (KJC) (Bankr. D. Del. 2009).  BOC not only agreed to keep the trust fully intact, but it clearly and unequivocally committed to pay additional cash funds into the trust, and to be bound by the Beta Trust Agreement's limitations on withdrawals therefrom.  As agreed in its Settlement Agreement with the Previous Owners, BOC continues to be bound by the trust agreement, as amended, and it has failed to identify any colorable basis by which it can now invade the *res* of the trust – whether by substitution, amendment, revocation, or otherwise – for its own economic benefit.  As a result, the Complaint must be dismissed.

## II.     LEGAL STANDARD

6.     Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable in bankruptcy proceedings pursuant to Federal Rule of Bankruptcy Procedure 7012, governs motions to dismiss based on plaintiff's failure to state a claim upon which relief can be granted. To survive a motion to dismiss pursuant to Rule 12(b)(6), plaintiffs must  plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007).  Pleading mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555.  Instead, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true ...." *Id*.

7.     Furthermore, a court "need not accept as true plaintiff's legal conclusions.  Nor must [the court] accept as true the complaint's factual allegations insofar as they contradict

exhibits to the complaint or matters subject to judicial notice." *Braude & Margulies P.C. v. Fireman's Fund Ins. Co.*, 468 F. Supp. 2d 190, 195 (D.D.C. 2007).   "[A]rgumentative inferences" also need not be drawn in plaintiff's favor and "legal conclusion[s] couched as … factual allegation[s]" need not be accepted.   *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013).   Accordingly, "where the interpretation of a contract is at issue, in considering the contract's terms to determine whether the plaintiff can prove any set of facts which would entitle it to relief, a court is not constrained to accept the allegations of the complaint in respect of the construction of the contract."   *CP III Rincon Towers, Inc. v. Cohen*, No. 10 Civ. 4638 DAB, 2011 WL 651434, at *2 (S.D.N.Y. Feb. 16, 2011).

8.     In this case, BOC has failed to plead sufficient facts entitling it to relief, particularly given that its incorrect construction and misreading of the governing agreements and court orders is entitled to no deference.   BOC's claims also fail as a matter of law.   Accordingly, the Complaint must be dismissed.[8]

### III.     <u>BACKGROUND</u>

9.     The following background facts are taken from the Complaint, and the agreements incorporated therein, and items of which this Court is permitted to take judicial notice, including materials filed in the Debtors' bankruptcy cases and other court orders.   *See, e.g.*, *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017–18 (5th Cir. 1996) (holding that "in deciding a motion to dismiss" courts may consider "the facts stated in the complaint," "the

---

[8] In addition to being subject to dismissal pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim, the Complaint is also subject to dismissal for lack of subject matter jurisdiction and/or failure to join a necessary party, pursuant to Fed. R. Civ. P. 12(b)(1) and (7), respectively, or alternatively, reference of the Complaint to the bankruptcy court must be withdrawn, for the reasons described more fully in *Defendants' Motion (1) to Dismiss the Complaint for Lack of Subject Matter Jurisdiction Pursuant to Fed. R. Civ. P. 12(b)(1) and/or Failure to Join a Necessary Party Pursuant to Fed. R. Civ. P. 12(b)(7) or (2) in the Alternative, to Withdraw the Reference* which motion is filed substantially contemporaneously herewith and the arguments from which are hereby incorporated herein by reference.

documents either attached to or incorporated in the complaint," and "matters of which they may take judicial notice"); *Wright v. Parkland Health & Hosp. Sys.* (*In re Wright*), No. 09-30499-SGJ-7, Adv. No. 11-03137, 2011 WL 1770411, at *2 (Bankr. N.D. Tex. May 9, 2011) (taking judicial notice, in adversary proceeding, of items filed in debtors' primary bankruptcy case); *Davis v. Bayless*, 70 F.3d 367, 372 (5th Cir. 1995) (approving district court's taking judicial notice of court order based on such orders being "matters of public record").

**A.      PERL's Acquisition and Subsequent Sale in Bankruptcy.**

10.      In 2006, when PERL acquired the Beta Assets from the Previous Owners, PERL agreed to perform, and to provide security for its performance of, the Beta P&A Obligations. *See* Complaint, ¶¶ 29-37.   Those performance obligations were reflected in the Beta Trust Agreement and the settling and formation of the Beta Trust, which were made expressly for the benefit of the Previous Owners.

11.      In 2009, PERL filed for bankruptcy and liquidated in chapter 11 proceedings before the Delaware bankruptcy court.  *In re Pac. Energy Res. Ltd.*, No. 09-10785 (KJC) (Bankr. D. Del. 2009).  As part of those proceedings, PERL sought to sell its interests in the Beta Assets. *See* Complaint, ¶¶ 45-46.  However, under governing federal regulations, PERL was unable to sell the Beta Assets free and clear of the Beta P&A Obligations.

12.      After PERL reached a tentative agreement to sell the Beta Assets to BOC, under agreements that initially contemplated a withdrawal of the trust assets, the Previous Owners objected.  Among other things, the Previous Owners argued that PERL and BOC did not have the requisite authority to withdraw trust assets without the Previous Owners' consent. *See* Complaint, ¶ 46.  The Previous Owners also filed adversary proceedings to establish certain payments due for overriding royalties related to the sale transaction.  PERL, BOC and the Previous Owners ultimately negotiated a settlement of the objection, the underlying issues, and

7

the adversary proceedings, which settlement agreement, and PERL's agreement to otherwise sell the Beta Assets to BOC (such agreements, collectively, the "**2009 Beta Sale Agreements**")[9], was approved in a December 23, 2009 order issued by the Delaware bankruptcy court (the "**Beta Approval Order**").[10] *See* Complaint, ¶ 46.  In addition to its express terms, the Beta Approval Order incorporated by reference and approved the 2009 Beta Sale Agreements.  *See*, Beta Approval Order, reattached hereto as Exhibit D, ¶¶ 3, 27.

13.     Pursuant to the terms of the Beta Approval Order and the 2009 Beta Sale Agreements, the parties negotiated a settlement and compromise of the Previous Owners' objection as part of that sale, and BOC acquired the Beta Assets from PERL, in exchange for, among other things, (i) BOC's credit bid of $80 million; (ii) BOC's assumption of all "Assumed Beta Liabilities" which liabilities expressly included the Beta P&A Obligations; and (iii) BOC's "accept[ance] and assum[ption of] the rights, duties and obligations of PERL" under the Beta Trust Agreement.[11]

14.     As part of its acquisition of the Beta Assets, BOC could have tried to negotiate an entirely new agreement to govern the Beta Trust with BOEM and the Previous Owners.  Instead, the parties agreed to use the basic structure of the Beta Trust Agreement, and only amended specific terms to reflect the BOC acquisition, per the Amended Beta Trust Agreement.  *See* Complaint, ¶¶ 52-56.  This arrangement was specifically part of the Settlement Agreement, and it was reviewed, and approved, by the PERL bankruptcy court in the Beta Approval Order.

---

[9] Each of the 2009 Beta Sale Agreements were incorporated into the Complaint. *See* Complaint, FNs 8, 9, 11, 12.

[10] *See* Order (I) Approving Sale of the Debtors' Beta Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests Pursuant to Sections 363(b), (f) and (m) of the Bankruptcy Code; (II) Assuming and Assigning Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief, *In re Pac. Energy Res. Ltd.*, No. 09-10785 (KJC) (Bankr. D. Del. Dec. 23, 2009).   A true and correct copy of the Beta Approval Order is attached hereto for the Court's convenience as **Exhibit D**.

[11] *See* Beta Approval Order, attached hereto as Exhibit D, ¶ G; *see* December 15, 2009 Purchase and Sale Agreement, § 1.12(e), which was incorporated into the Complaint, *see* Complaint, FN11. A true and correct copy of the December 15, 2009 Purchase and Sale Agreement is reattached hereto as **Exhibit C** for the Court's convenience.

**B.      BOC's Bankruptcy Filing and Non-Rejection of the 2009 Beta Sale Agreements**

15.      On January 16, 2017 (the "**Petition Date**"), the Debtors, including BOC, filed voluntary petitions for reorganization under chapter 11 of the Bankruptcy Code.   Shortly thereafter, the Debtors filed a disclosure statement [Bankr. D.I. 246] (the **"Disclosure Statement**") and plan [Bankr. D.I. 341] (the "**Plan**") which, following certain revisions, was confirmed by this Court on April 14, 2017 [Bankr. D.I. 344] (the "**Confirmation Order**").

16.      Pursuant to Section 8.1 of the Plan, the Debtors *assumed all executory contracts* "to which any of the Debtors are parties" except for those contracts that (a) had already been rejected pursuant to a prior Final Order of the Bankruptcy Court; (b) were the subject of a separate motion to reject filed by the Debtors prior to the Effective Date; or (c) were specifically designated as contracts to be rejected on the "Schedule of Rejected Contracts and Leases."   To the extent they could be deemed executory contracts, the 2009 Beta Sale Agreements did not fall within the first two categories as they were not rejected prior to approval of the Plan, and were not the subject of a separate rejection motion filed by the Debtors before the Effective Date. Moreover, the Schedule of Rejected Contracts and Leases was included as Exhibit G to the plan supplement filed by the Debtors on March 24, 2017 [D.I. 283] and provided that "[t]he Debtors do not currently intend to reject any executory contracts or unexpired leases."   As a result, pursuant to the Debtors' approved Plan, to the extent they could be deemed executory contracts, all of the 2009 Beta Sale Agreements, including the Amended Beta Trust Agreement, the Settlement Agreement and the related contracts associated with the BOC's acquisition of the Beta Assets, were assumed by BOC in the present bankruptcy cases.

C.    **The Complaint**

17.    By the Complaint, BOC now purportedly seeks, in effect, to implement Section 4.3(b)(i) of the Plan,[12] under which BOC seeks to obtain a unilateral release of funds from the Beta Trust to BOC, to be replaced by Beta Replacement Sureties (as described further below). Following this non-consensual substitution of trust assets, the Plan asserts that the Previous Owners would retain "a lien in the proceeds of the Beta Replacement Sureties" and/or in any "new sureties" that Debtors obtain "to secure performance of the Beta P&A Obligations (in addition to the Beta Replacement Sureties)" subordinate only to BOEM's interest.[13]    For the reasons described herein, BOC fails to state a claim upon which relief can be grated.  As a result, each of its claims must be dismissed.

## IV.    <u>ARGUMENT</u>

A.    **BOC's Prior Release And Covenant Not To Sue Bar Its Claims**

18.    As a threshold matter, BOC's Complaint must be dismissed on the independent basis that BOC has already settled, compromised and released the Previous Owners from the claims at issue, and covenanted not to sue the Previous Owners thereon, pursuant to the terms of the 2009 Beta Sale Agreements and the Settlement Agreement.  Specifically:

- pursuant to Section 4.1 of the Settlement Agreement, BOC "release[d] and discharge[d] the Previous Owners and their respective Associated Parties from each Claim and Liability relating to … the Beta Interests (including the Beta Tangible Assets) … and the Properties and the transactions contemplated by the Aera PSA, the Noble PSA, the SWEPI PSA and by this Agreement (including all Abandonment Obligations),

---

[12] In reality, BOC seeks to do more than permitted or set forth in the Plan, and the Previous Owners will address that *infra*.

[13] *See* Plan, § 4.3(b)(i) [Bankr. D.I. 341].

regardless of when or how the Claim or Liability arose or accrued, or arises or accrues, or whether the Claim or Liability is foreseeable or unforeseeable"; and

- pursuant to Section 4.2 of the Settlement Agreement, BOC "covenant[ed] not to sue the Previous Owners or their respective Associated Parties with regard to any Claim or Liability relating to … the Beta Interests (including the Beta Tangible Assets) … and the Properties and the transactions contemplated by the Aera PSA, the Noble PSA, the SWEPI PSA and by this Agreement (including all Abandonment Obligations), regardless of when or how the Claim or Liability arose or accrued, or arises or accrues, or whether the Claim or Liability is foreseeable or unforeseeable."

19.     The Settlement Agreement is governed by California law, *see* Settlement Agreement § 6.6, under which releases and covenants not to sue are enforceable and serve as a sufficient basis to dismiss claims. *See, e.g.*, *Skilstaf, Inc. v. CVS Caremark Corp.*, No. C 09-02514 SI, 2010 WL 199717, at *5 (N.D. Cal. Jan. 13, 2010), *aff'd*, 669 F.3d 1005 (9th Cir. 2012) (holding that "covenant not to sue contained in … settlement is enforceable against [a plaintiff] and bars its claims"); *see also Blue Phoenix Media Inc. v. Essociate Inc.*, No. CV 12-00834-JVSMLGx, 2012 WL 12888834, at *3 (C.D. Cal. June 15, 2012) (holding that "a covenant not to sue is sufficient grounds to dismiss a claim that is a subject of that covenant"). BOC's claims are covered by each of the release and covenant not-to-sue provisions referenced above, as they unquestionably relate to "the Beta Interests" and "the Properties and the transactions contemplated by the Aera PSA, the Noble PSA, the SWEPI PSA and by this Agreement (including all Abandonment Obligations)." These provisions were built upon the Beta Trust Agreement. As a result, by their plain terms, BOC's claims must be dismissed.[14]

---

[14] The Settlement Agreement, reattached hereto as Exhibit C, "burdened" the property interests acquired by BOC, and it was duly recorded as required by relevant law to put all parties on notice of the limitations such agreement

**B.      The *Res* Of The Beta Trust Is Not Property Of BOC's Estate**

**i.      BOC's Bankruptcy Does Not Expand Its Limited, Contingent Interest In The Beta Trust Funds Which Interest Is Not Sufficient To Render The Beta Trust Funds Property Of BOC's Estate**

20.     Turning to the substance of BOC's claims, even if it was not settled and compromised by BOC's prior release and covenant not to sue, BOC's first claim, which seeks a declaration that the Beta Trust Funds are property of BOC's estate, must be dismissed because the Beta Trust Funds were not property of BOC's estate *as of the Petition Date* and cannot be transformed into property of BOC's estate merely as a result of BOC's bankruptcy filing. *See, e.g.*, *Dolphin Titan Int'l, Inc. v. Gray & Co., Inc. (In re Dolphin Titan Int'l, Inc.)*, 93 B.R. 508, 512 (Bankr. S.D. Tex. 1988) ("The general rule regarding estate property is that the estate is entitled to the same rights that the debtor held prior to the filing of bankruptcy. Section 541 was not created to enlarge the debtor's rights against others beyond those existing at the commencement of the case."); *see also N.S. Garrott & Sons v. Union Planters Nat'l Bank of Memphis (In re N.S. Garrott & Sons)*, 772 F.2d 462, 466 (8th Cir. 1985) ("[A]n interest limited in the hands of the debtor is equally limited in the hands of the estate….").

21.     Upon dismissal of its first count, each of BOC's ensuing counts must also be dismissed since, if the Beta Trust Funds are not property of BOC's estate, the Bankruptcy Court has no jurisdiction to direct particular actions with respect to such non-estate assets, which is the gravamen of the other counts. *See, e.g.*, *A Whale Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 522-26 (5th Cir. 2014) (reversing district and bankruptcy court orders approving postpetition financing secured by stock, finding that stock was not

_____

placed upon the Beta Assets.  Although these arguments or the permanent limitations on the property interests BOC possesses are not briefed or raised in conjunction with this Fed. R. Civ. P. 12(b)(6) argument, the Previous Owners reserve the right to raise this and additional legal arguments that would prohibit and bar the relief being sought by BOC in its Complaint.

property of the estate and courts therefore lacked jurisdiction to issue any further orders with respect to such property).

22.     BOC's precise basis for claiming that the Beta Trust Funds are property of its estate is unclear.  In certain instances, BOC appears to base its claim on a theory that it can "substitute[e]" the *res* of the Beta Trust. *See* Complaint ¶¶ 62, 98, 110.  In other instances, BOC appears to argue that it is entitled to relief because it can (presumably at some point in the future) unilaterally revoke or amend the Beta Trust (though it has not done so previously and not actually sought affirmative relief in its Complaint to do so). *See* Complaint ¶¶ 3, 44, 73, 75. Regardless of its theory, none is consistent with the Beta Trust Agreement or applicable law and thus BOC fails to establish that the Beta Trust Funds themselves are property of BOC's estate.

23.     To the contrary, BOC's only interest in the Beta Trust Funds as of the Petition Date was a contingent and limited interest, namely, a springing right to receive such funds if and when it fulfilled its Beta P&A Obligations and only if there were any funds remaining.  Because that was BOC's only interest in the Beta Trust Funds as of the Petition Date, that interest remains BOC's sole interest following the bankruptcy filing.  As a result, the underlying Beta Trust Funds themselves remain outside of BOC's estate.  *See, e.g., In re Atl. Gulf Cmtys. Corp*., 369 B.R. 156, 164 (Bankr. D. Del. 2007) (agreeing with the "majority of courts" that a trust or account "from which the debtor is entitled to payments [only] after satisfying a condition" for the benefit of other parties is not property of the estate since the debtor's bankruptcy alone is "not sufficient to divest" the other parties of their interest); *see also LTF Real Estate Co., Inc.*, *v. Expert South Tulsa, LLC* (*In re Expert South Tulsa, LLC*), 619 F. App'x 779, 782 (10th Cir. 2015) (holding that where (a) prepetition, a debtor places money with a third party "under an agreement for the protection of someone else;" (b) the money "remains in the possession" of the

third party as of the petition date; and (c) the debtor "is entitled to receive the funds (or some portion of them) only after fulfilling certain conditions as yet unmet at the time of the bankruptcy," the funds do not become part of the debtor's bankruptcy estate unless and until the "contingencies are satisfied").[15]

### ii. BOC Cannot Substitute The *Res* Of The Beta Trust

24.     BOC labors mightily in its filed papers (including its recently filed and premature summary judgment motion) to argue that the Previous Owners have agreed that BOC can substitute replacement sureties for the funds that are the current *res* of the Beta Trust.  Yet for all its efforts, BOC cannot point to a single specific provision in any of the governing agreements allowing such substitution.  They cannot point to any such language *because it does not exist*. To the contrary, a plain reading of the agreements at issue yields the opposite conclusion. BOC may not convert what is, at best, a contingent interest into a non-contingent interest through its bankruptcy (or this adversary proceeding).

25.     *The 2006 Agreements*. In the original agreements in which PERL acquired the Beta Assets from the Previous Owners, PERL agreed to "pay all costs and expenses associated with the obligations assumed under Section 11.09(a) [i.e., the Beta P&A Obligations]."[16] Because Aera and the other Previous Owners wanted reassurance that such obligations would in fact be satisfied – *i.e.*, that the Previous Owners would not be left with merely a promise to

---

[15] *See also In re Palm Beach Heights Dev. & Sales Corp.*, 52 B.R. 181, 183 (Bankr. S.D. Fla. 1985) (holding that a fund established by debtor under state law to "assure the completion" of "road and drainage improvements" was not property of the estate and that, instead, the estate's interest was limited solely to the debtor's right, "upon completion of the improvements," to the residual of the fund); *Dolphin Titan Int'l, Inc.* at 512 (rejecting debtor's contention that funds in an account that it had established prepetition with an insurance company in order to provide employee insurance coverage, and from which debtor was entitled to excess funds once all insurance claims were satisfied, were property of the estate since, to hold otherwise, would improperly convert debtor's "contingent right into a non-contingent right").

[16] *See* November 1, 2006 Purchase and Sale Agreement, § 11.09(b), which was incorporated into the Complaint. *See* Complaint at FN3. A true and correct copy of the November 1, 2006 Purchase and Sale Agreement is reattached hereto as **Exhibit A** for the Court's convenience.

perform, rather than performance itself – the Previous Owners requested that PERL secure "performance and payment" of the Beta P&A Obligations, and PERL did so.

26.    With respect to Aera, PERL agreed to either (i) deliver "a letter of credit, in form and substance satisfactory to Aera, a cash deposit or U.S. Treasury notes;" (ii) establish an "escrow account at a federally-insured national financial institution;" or (iii) obtain "a performance bond or other financial security substantially in the form" of an exhibit attached to the purchase agreement "executed and acknowledged by [PERL] and an institution acceptable to Aera… ([and] not an 'area-wide' bond)" in each case in the amount of $90 million.[17]  Any of those forms of direct security to Aera were defined as the "Aera Bond" and were to be delivered to Aera at closing.[18]

27.    However, the Previous Owners also agreed that if PERL was required by BOEM's predecessor, the MMS, "to post one or more performance bonds … or other forms of financial security (including any supplemental bonds)" with respect to the Beta P&A Obligations, the Aera Bond could be reduced by the amount of such "Governmental Bond."[19]  In turn, PERL agreed that if such bond was later "lowered by the MMS or such bond is no longer required or otherwise lapses," the Aera Bond would be restored, increased or delivered so that such security for the Previous Owners at all times exceeded $90 million. *Id.*  Nothing in these highly negotiated sections, or anything else in the agreement, suggests that the form of the Aera Bond or Governmental Bond, once established, could be altered without the Previous Owners' agreement, other than that an Aera Bond could be required post-closing if MMS agreed to lower the Governmental Bond amount.

---

[17] *See*, November 1, 2006 Purchase and Sale Agreement, reattached hereto as Exhibit A, § 11.09(b).

[18] PERL's agreements with the other Previous Owners' included consistent terms.  *See* Complaint, ¶ 34.

[19] *See*, November 1, 2006 Purchase and Sale Agreement, reattached hereto as Exhibit A, § 11.09(c).

28.     BOC ignores these specific provisions and, instead, seeks to seize upon the standard, security interest-granting language, contained elsewhere in the agreement, pursuant to which PERL granted to Aera "a continuing security interest in each Governmental Bond and the proceeds thereof, ***and any substitute or replacement security*** given from time to time, to secure PERL's payment and performance of" the Beta P&A Obligations as a basis for its ability to substitute the *res* of the Beta Trust now.[20]   BOC has not cited, and cannot cite, any authority for its unique, made-for-litigation position that an expansive collateral grant (covering proceeds of collateral or substitute or replacement collateral) now gives BOC, as successor to the grantor, an unfettered ability to substitute collateral at its choosing, particularly in the context of a 78-page, heavily negotiated purchase agreement among sophisticated parties.   The simple interpretation of the agreement is the correct one and is clear from the agreement's face: the parties negotiated around security; PERL established the Beta Trust as the form of the "Governmental Bond" at issue; and once created, nothing in the agreement allowed PERL or its successors in interest to unilaterally change the form of the Governmental Bond (such as by substituting surety bonds for the treasury notes, its proceeds and any other contributions to the Beta Trust).

29.     ***The 2009 Agreements***. To the extent there could be any doubt regarding this interpretation of the 2006 agreements or the obligations of BOC, it is amply clarified by the 2009 Beta Sale Agreements pursuant to which BOC acquired the Beta Assets from PERL. Specifically, the Beta Trust Agreement (as amended as part of 2009 Beta Sale Agreements) is clear that, following BOC's acquisition of the Beta Assets, BOEM and the Previous Owners would continue to benefit from treasury notes, their proceeds and subsequent cash payments as the trust *res*, which would remain the primary security for the Beta P&A Obligations.  As of the

---

[20] *See*, November 1, 2006 Purchase and Sale Agreement, reattached hereto as Exhibit A, § 11.09(h).

date of that amended agreement (May 14, 2010), the original $90 million Treasury Note that PERL had used to settle the Beta Trust under the Beta Trust Agreement had "accrued interest and, as of April 30, 2010, the total balance in the Trust Account was equal to $99,073,882.31."[21] However, because BOEM had upwardly revised the potential Beta P&A Obligations to $152,000,000, BOC agreed to ensure that the trust "be *funded* with an amount equal to [$152,000,000] on or before December 31, 2016."[22]   Notably, the agreement nowhere refers to any potential bonding or security; to the contrary, it required BOC, as the "Successor Settlor" to "deposit … *[p]ayments* at minimum of $1,250,000 per quarter"; to provide a "verified statement evidencing the *quarterly payments*, earned interest, if any, and the *balance* of the Trust Account"; and to the extent there were any shortfall, "to *deposit such additional funds* into the Trust Account as necessary."[23]   Similarly, even the "Supplemental Bond Treasury Note" was defined only to include "such note together with the reinvestment of earnings from such note, its replacement notes and if necessary, additional capital contributions."[24]

30.     Taken alone, any one of these provisions indicates the intent of the parties that BOC would make additional *cash deposits* to the Beta Trust.  When read together, however, they lay bare the absurdity of BOC's position that it was somehow allowed to post surety bonds, from an as-yet unnamed surety in an unknown form, to satisfy its obligations, rather than depositing cash into to the Beta Trust to secure its obligations.  BOC's position cannot be squared with plain English, particularly in the context of the heavily negotiated and carefully drafted agreements at issue here.  Like the 2006 agreements before it, nothing in the Beta Trust Agreement, as

---

[21] *See* Amended Beta Trust Agreement, Recitals, which was incorporated into the Complaint.  *See* Complaint, FN 12. A true and correct copy of  the Amended Beta Trust Agreement is reattached hereto as **Exhibit F** for the Court's convenience.

[22] *See* Amended Beta Trust Agreement, reattached hereto as Exhibit F, § 2.2(a) (emphasis added).

[23] *See* Amended Beta Trust Agreement, reattached hereto as Exhibit F, § 2.2(a), (c) (emphasis added).

[24] *See* Amended Beta Trust Agreement, reattached hereto as Exhibit F, Recitals.

amended, ever suggests, much less expressly provides for, any right to substitute surety bonds for cash or cash equivalents held in trust.

31.     With respect to the other governing terms of the Amended Beta Trust Agreement, the Trustee agreed not to permit withdrawal of the Beta Trust Funds except on terms expressly permitted by that agreement.[25] Pursuant to these terms, only "[u]pon completion of all plugging and abandonment operations pertaining to" the Beta Assets, and "with the written concurrence of [BOEM] and the [Previous Owners]," would BOC become entitled "to a disbursement of the amount incurred in such plugging and abandonment operations."[26] Even then, the Trustee is only permitted to release such amounts to BOC in accordance with a "joint certificate of [BOC], [BOEM] and the [Previous Owners] delivered to the Trustee."[27] No other disbursements to BOC are permitted.

32.     In the event BOC either fails to submit documentation demonstrating that it has satisfied its Beta P&A Obligations within 30 days after any such obligations accrue, or otherwise fails to perform and complete such obligations in a "timely and faithful manner," an "event of default attributed to [BOC]" shall be deemed to occur.[28] In that event, the Trustee is authorized to "assign, transfer and deliver … all or any portion" of the Beta Trust Funds to BOEM,[29] so long as the Previous Owners retain a security interest in such funds, subordinate to BOEM, "to secure payment and performance of" the Beta P&A Obligations.[30] Consistent with BOEM's senior position, and the Previous Owners' subordinate position, BOEM is required to consent to

---

[25] *See* Beta Trust Agreement, § 2.4(a) which was incorporated into the Complaint. *See* Complaint at FN 8. A true and correct copy of the Beta Trust Agreement is reattached hereto as **Exhibit B** for the Court's convenience.

[26] *See* Beta Trust Agreement, reattached hereto as Exhibit B, §§ 4.2, 4.3.

[27] *See* Beta Trust Agreement, reattached hereto as Exhibit B, § 4.3.

[28] *See* Beta Trust Agreement, reattached hereto as Exhibit B, § 4.4.

[29] *See* Beta Trust Agreement, reattached hereto as Exhibit B, § 4.4.

[30] *See* Beta Trust Agreement, reattached hereto as Exhibit B, § 2.6

any other party's direction to the Trustee to release the Beta Trust Funds following BOC's default, while the Previous Owners' consent is not required for a release of the Beta Trust funds directly to BOEM.  The Previous Owners were, however, made express third-party beneficiaries of the Beta Trust Agreement and must affirmatively consent to *any* release of the Beta Trust funds to BOC.[31]

33.     Other than the foregoing, there is no provision in the Amended Beta Trust Agreement permitting the Beta Trust Funds to be released to BOC.  This is unsurprising, since, as discussed further below, such restrictions on transfer were necessary in order for the Beta Trust to qualify as the intended "Lease Specific Abandonment Account"[32] under and subject to governing BOEM rules and regulations.  Specifically, pursuant to those rules and regulations, once the Beta Trust Agreement was agreed to by BOEM as being sufficient to secure the Beta P&A Obligations, BOC was required to continuously "fully fund" the Beta Trust to cover all Beta P&A Obligations, *see* 30 C.F.R. § 556.904(a)(2), and to ensure that the Beta Trust funds were "payable upon demand to BOEM and pledged" to meet BOC's Beta P&A Obligations. *See* 30 C.F.R. § 556.904(a)(1).

34.     The related 2009 Beta Sale Agreements, and the Beta Approval Order that approved them, are similarly replete with agreements by BOC not to disturb the Beta Trust Funds, and certainly not to substitute such funds for other collateral, unless and until BOC's Beta P&A Obligations are fulfilled and, even then, only under specific conditions.  Among other terms, per these agreements, BOC agreed that: (1) it would abide by all terms of the Beta Trust

---

[31] *See* Beta Trust Agreement, reattached hereto as Exhibit B, §§ 4.2, 4.3 and 5.3.

[32] *See* Beta Trust Agreement, reattached hereto as Exhibit B, Final WHEREAS clause ("WHEREAS, the Settlor and Successor Settlors have established a trust account designated as 'Pacific Energy Resources Ltd. Decommissioning Liabilities Trust Account,' having account number 104821002 maintained with the Trustee (the 'Trust Account'), *which is a lease-specific abandonment account pursuant to the Beneficiary's rules and regulations*.") (emphasis added).

Agreement; (2) the Previous Owners would retain all of their rights and security interests in the Beta Trust Funds, subordinate only to BOEM's rights, to ensure BOC's fulfillment of its Beta P&A Obligations; and (3) it would not, at any point, take any action to impair the Previous Owners' rights and security interests in the Beta Trust Funds.[33]

35.     Finally, to the extent any of the 2009 Beta Sale Agreements were subject to rejection in the Debtors' bankruptcy cases, BOC did not reject them and has assumed them, so BOC remains bound by each term and covenant in the agreements.[34]   In fact, to the extent executory, BOC and the other Debtors expressly assumed these agreements along with each of the Debtors' other contracts.  *See supra* ¶ 16.   As a result, these agreements remain binding in accordance with their terms, none of which include provisions permitting the release of the Beta Trust Funds, and substitution of other collateral, at BOC's request.   Instead, under the agreements' plain terms, only "[u]pon completion of all plugging and abandonment operations pertaining to" BOC's Beta P&A Obligations, "with the written concurrence of [BOEM] and the [Previous Owners]" will BOC become entitled "to a disbursement of the amount incurred in such plugging and abandonment operations" and, even then, only upon BOEM's and the Previous Owners' written concurrence.[35]   Because BOC concedes that the Beta P&A Obligations have not yet been satisfied, there is no basis for a release of the Beta Trust Funds or for BOC to substitute other collateral for the Beta Trust Funds.

---

[33] *See* Beta Approval Order, attached hereto as Exhibit D, ¶ 3; Settlement Agreement, reattached hereto as Exhibit E, § 3.2(b); Complaint, ¶¶ 47-48.

[34] BOC's decision not to seek rejection of the 2009 Beta Sale Agreements as part of its bankruptcy is unsurprising given that, once they were approved by the PERL bankruptcy court, such agreements became unrejectable.  The court's judgment "replace[d] the consensual obligations of contract with a new set of duties imposed by judicial command."  *Roxse Homes, Inc. v. Roxse Homes Ltd. P'ship*, 83 B.R. 185, 187 (D. Mass).  And that court judgment cannot be "rejected."  *Id.*; see *also In re Giordano*, 446 B.R. 744, 749 (Bankr. E.D. Va. 2010) ("[O]nce a court decrees specific performance of a contract, the contract is no longer executory and cannot be rejected.").  Indeed, the limitations by which BOC acquired the Beta Assets serve as permanent burdens on those property interests (a dispositive legal argument the Previous Owners reserve for a later point in time, if necessary).

[35] *See*, Beta Trust Agreement, reattached hereto as Exhibit B, §§ 4.2, 4.3.

iii.        **BOC Cannot Revoke Or Amend The Beta Trust**

36.     Apparently recognizing its inability to "substitute" the *res* of the Beta Trust under the governing agreements, BOC seeks to enlarge its power over the Beta Trust Funds, through some combination of the (purportedly) revocable nature of the trust and/or the parties' ability to amend the governing trust agreements.  But BOC cannot unilaterally amend or revoke the Beta Trust.  With respect to unilateral amendment, the Beta Trust Agreement bars such action and makes clear that no amendments are permitted without the Previous Owners' consent.  Further, despite BOC's protestations to the contrary, the Beta Trust is not revocable, both as a matter of applicable federal law (which would preempt any applicable California law to the contrary) and also under a correct construction of California law, if it were applicable. In addition, to revoke the Beta Trust Agreement would be to violate or otherwise be inconsistent with the 2009 Beta Sale Agreements, which are the subject of the Beta Approval Order, as ordered by the PERL Bankruptcy Court.   As a result, the Beta Trust cannot be amended or revoked and BOC must instead be held to its terms, pursuant to which the Beta Trust Funds are not property of BOC's estate.

a.        **BOC Cannot Unilaterally Amend The Beta Trust**

37.     The Beta Trust Agreement is clear that its terms cannot be amended, modified or waived without Aera and SWEPI's consent.  *See*, Beta Trust Agreement, reattached hereto as Exhibit B, § 5.1 ("The parties hereto agree and acknowledge that they shall not amend, modify or waive any term or condition of this Agreement in any respect without the prior written consent of the Predecessors."); *see also* Settlement Agreement, reattached hereto as Exhibit E, § 3.2(b) ("Buyers and Successor Operator acknowledge, covenant and agree that the Previous Owners shall retain, and Buyers and Successor Operator shall not take any actions to impair, all existing rights and security interest the Previous Owners possess with respect to the MMS Trust

21

Agreement…").   BOC has not and cannot allege that Aera or SWEPI has agreed to any amendment, modification or waiver of the Beta Trust Agreement in connection with BOC's request to have funds released from the Beta Trust.   As such, even if, for example, BOC and BOEM had agreed to such an amendment, such an amendment would still not be permitted under the Amended Beta Trust Agreement's plain terms.

> **b.   The Beta Trust Is Irrevocable Under OCSLA And BOEM's Regulations Thereunder**

38.   The Beta Assets are located in the Outer Continental Shelf of the United States which area is subject to federal, rather than state, jurisdiction and statute, in accordance with the Outer Continental Shelf Lands Act ("**OCSLA**").   *See* 43 U.S.C. § 1331(a)(1).[36]   The United States Secretary of Interior is required to administer OCSLA, by "prescribe[ing] such rules and regulations as may be necessary to carry out [its] provisions" and has delegated that authority to BOEM.   *See* 43 U.S.C. § 1334(a); 30 C.F.R. § 550.101.[37]   As acknowledged within the Amended Beta Trust Agreement itself, the Beta Trust was established in order to comply with these BOEM rules and regulations which require, *inter alia*, that each Beta Asset operator guaranty the Beta P&A Obligations, by posting financial assurances.   *See*   30 C.F.R. §§ 556.900-556.907.   Specifically, the Beta Trust constituted a "lease specific abandonment account" under the predecessor to BOEM regulation 30 C.F.R. § 556.904 (the regulation cited in the Beta Trust Agreement's title).   *See*, Beta Trust Agreement, reattached hereto as Exhibit B, Recitals.   In accordance with that regulation, once the Beta Trust Agreement was agreed to by BOEM, BOC

---

[36] *See also Chevron Oil Co. v. Huson*, 404 U.S. 97, 100 (1971) ("[OCSLA] makes the Outer Continental Shelf, including fixed structures thereon, an area of exclusive federal jurisdiction….").

[37] *See also Defs. of Wildlife v. Bureau of Ocean Energy Mgmt.*, 684 F.3d 1242, 1246 (11th Cir. 2012) ("OCSLA governs federal offshore oil and gas leasing, exploration, and development, and gives the Secretary of the Interior authority over the administration of offshore leasing. … The Secretary delegated the authority to 'regulate oil, gas, and sulphur exploration, development, and production operations on the Outer Continental Shelf (OCS)' to the BOEM").

was required to continuously "fully fund" the Beta Trust to cover all Beta P&A Obligations, *see* 30 C.F.R. § 556.904(a)(2), and to ensure that the Beta Trust Funds were "payable upon demand to BOEM and pledged" to meet the Beta P&A Obligations. *See* 30 C.F.R. § 556.904(a)(1).

39.     Nowhere does 30 C.F.R. § 556.904 contemplate an operator such as BOC having the unilateral authority to revoke a lease specific abandonment account.  In fact, to allow such a unilateral revocation would be nonsensical – the reason for such an account is to ensure that BOEM is not left with a mere promise by an operator to perform rather than performance itself, but to allow an operator to revoke trust assets at any time at the operator's choosing, would be to allow just that.  To the contrary, BOEM regulations make clear that funds in a lease specific abandonment account are restricted and must be ***pledged*** to BOEM.

40.     Under Section 541(c)(2) of the Bankruptcy Code, a "restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case" under Chapter 11.  The phrase "applicable nonbankruptcy law" is not limited to state law.  *Patterson v. Shumate*, 504 U.S. 753, 759 (1992). Instead, "[p]lainly read, the provision encompasses any relevant nonbankruptcy law, including federal law…." *Id*. "If federal nonbankruptcy law imposes an enforceable restriction on the transfer of a debtor's beneficial interest in a trust, that interest is not included in the bankruptcy estate."  *Bohm v. Brewer* (*In re Brewer*), 154 B.R. 209, 212 (Bankr. W.D. Pa. 1993).

41.     BOEM's regulatory restrictions on BOC's ability to use the Beta Trust Funds for anything other than the payment of the Beta P&A Obligations qualify as "applicable nonbankruptcy law" under Section 541(c)(2) and are thus enforceable in this case. Because the Beta Trust Funds are therefore "trust property under federal law, and subject to the transfer restrictions set forth in the applicable federal regulations" the Beta Trust is not revocable and the

Beta Trust Funds are not property of BOC's estate.  *See, e.g., Warfield v. Frank-Hill* (*In re Frank-Hill*), 300 B.R. 25 (Bankr. D. Ariz. 2003) (holding that U.S. Department of Interior restrictions on the ability of a debtor to access funds on its "Individual Indian Money" account rendered such funds outside of the debtor's estate).

### c. To The Extent California Law Deems The Beta Trust Revocable It Is Inapplicable

42. While "[a]ll law applicable to the Outer Continental Shelf is federal law," to fill "the substantial gaps" in the coverage of federal law, OCSLA, in certain contexts, borrows laws of the adjacent states as "surrogate federal law." *Gulf Offshore Co. v. Mobil Oil Co.*, 453 U.S. 473, 480 (1981).  BOC appears to be relying on this concept when it asserts that the Beta Trust is revocable based on California law.  *See* Complaint, at ¶ 44.  However, OCSLA is clear that adjacent state law is only applicable when it is "not inconsistent with [OCSLA] or with other Federal laws and regulations." 43 U.S.C. § 1333(a)(2)(A).  In this case, to the extent California law would deem the Beta Trust to be revocable (which, as discussed *infra*, it does not), such law would be inconsistent with BOEM regulations and other federal law.  As a result, it would not apply.

43. There are "few cases that address" how to determine whether a state law is inconsistent with federal regulations under OCSLA, and those cases that do discuss the issue "do little more than state that under OCSLA state law is applied to the extent that it is not inconsistent with Federal law." *Richardson v. Kerr-McGee Oil & Gas Corp.*, No. Civ. A. 08-1074, 2011 WL 2565315, at *4 (E.D. La. June 28, 2011).  However, OCSLA's requirement that courts assess whether federal law is "inconsistent" with state law resembles the Supreme Court's analysis in the area of federal common law in which, in order for federal courts sitting in diversity to be able to fashion federal rules of decision, they must first identify a "significant

conflict" between "some federal policy or interest and the use of state law." *Atherton v. FDIC*, 519 U.S. 213, 218 (1997). In that area of the law, state laws are deemed to conflict with federal law to the extent they are "aberrant or hostile" to an "identifiable federal policy or interest." *Burks v. Lasker*, 441 U.S. 471, 479-80 (1979).

44. Applying that standard to this case, any state law that would deem a lease-specific abandonment account, posted to address federal decommissioning obligations on a binding basis, unilaterally revocable at will by an operator would be directly "aberrant or hostile" to an "identifiable federal policy" – *i.e.*, the BOEM policy, made clear in the applicable regulations, to require continuous security for oil and gas operators' obligations on the Outer Continental Shelf including obligations such as the Beta P&A Obligations. To allow operators to unilaterally revoke such accounts would make a pledge of such assets, such as the Beta Trust Funds, wholly illusory. As a result, to the extent California law would deem the Beta Trust revocable it would be "inconsistent" with OCSLA and governing BOEM regulations and thus that aspect of California law, if it existed, would be inapplicable.[38]

### d. Even If It Is Incorporated Into Federal Law Under OCSLA, California Law Does Not Provide That The Beta Trust Funds Are Property Of BOC's Estate

45. Moreover, under a correct reading, even under California law, the Beta Trust is irrevocable, thus rendering such law consistent with governing BOEM regulations and applicable under OCSLA. *See* 43 U.S.C. § 1333(a)(2)(A).[39] Specifically, under California law, "[w]here

---

[38] While BOC makes much of the consent that it purported to obtain from BOEM prepetition without any communications or contact with the Previous Owners, BOEM concedes that at the time such a request was put to it, its personnel in California forgot about and did not read the Amended Beta Trust Agreement prior to communicating with BOC. Counsel for BOEM has urged the Previous Owners to understand that the government did not intentionally breach the Amended Beta Trust Agreement and has withdrawn any consent it may have given, the validity of such consent BOEM now apparently questions or contests.

[39] On its face, the Beta Trust Agreement makes clear it is not able to be revoked by the settler. The Previous Owners understand that BOC contends certain, specific magic words were required to establish irrevocability on its face, despite unambiguous wording in the Beta Trust Agreement that establishes that fact. For purposes of this motion,

parties trade consideration in order to create a trust, they move beyond the normal realm of trust law." *Sanchez v. Guerrero*, No. C 98-4062 CRB, 2000 WL 298910, at *3 (N.D. Cal. Mar. 14, 2000). In such circumstances, once a party receives consideration for depositing assets in trust for the benefit of a third party, the trust becomes irrevocable, regardless of any otherwise applicable statute or law, and the trust assets therefore cannot become party of the depositing party's bankruptcy estate. See *United States v. Lawrence*, 189 F.3d 838, 845 (9th Cir. 1999) ("Assets transferred to an irrevocable trust do not become part of the estate...."); *see also Menotte v. Brown* (*In re Brown*), 303 F.3d 1261, 1270 (11th Cir. 2002) ("By establishing an irrevocable trust in favor of another, a settlor, in effect, gives her assets to the third party as a gift. Once conveyed, the assets no longer belong to the settlor and are no more subject to the claims of her creditors than if the settlor had directly transferred title to the third party.").

46. In *Goss v. Edwards*, for example, Ann Goss ("**Ann**") claimed she could revoke a voting trust under which, as part of a larger divorce settlement, she had conveyed her right to vote on corporate matters relating to her ex-husband's company to her ex-husband, based on a California statute that permits such trusts to be revoked at any time by a majority of beneficial holders (a threshold Ann herself met). *Goss v. Edwards*, 68 Cal. App. 3d 264, 267-68 (Cal. Ct. App. 1977). The California state court disagreed, holding that Ann was estopped from revoking what otherwise might have been a revocable trust based on her acceptance of "substantial benefits" under the larger divorce settlement. *Id*. at 271. Specifically, the court held that to allow Ann to revoke in such circumstances would be "detrimental" to her ex-husband "who relied on the agreement and honored its provisions for more than five years, and that revocation of the voting trust would do violence to the [larger divorce settlement] and deprive [Ann's ex-husband]

---

the Previous Owners jump past that issue, as a dispute on the wording is of no moment when other consideration or reliance has been given and creates irrevocability, and the motion therefore focuses on that aspect of California law which bars BOC's claims whether key words were used or not.

of his bargained-for consideration." *Id*. at 271-72.  Instead, the appellate court held that the trial court had properly held that such trust was irrevocable. *Id*.

47.     Similarly, in *Touli v. Santa Cruz County Title Co*., a borrower sought to revoke a deed of trust he had pledged to secure a loan, which deed was silent as to its revocability. *See Touli v. Santa Cruz Cty. Title Co*., 67 P.2d 404, 405 (Cal. 1937).   A trial court allowed revocation based on Civil Code section 2280, the predecessor to the California Probate Code cited by BOC for the proposition that, under California law, a trust is deemed revocable unless expressly made irrevocable.  *See* Complaint, ¶ 75 citing CAL. PROB. CODE § 15400.[40]   The intermediate California appellate court reversed, finding that, regardless of what the California Probate Code might provide, a trust "given as security for the payment of an obligation" was not revocable.  *Touli*, 67 P.2d at 405.  The court held that to permit revocation in such context "would inevitably lead to absurdity, dishonor and fraud," and that such a construction was therefore "not to be preferred to one 'consisting of sound sense and wise policy,' and fair practice."  *Id*. at 406.

48.     The Beta Trust was unquestionably pledged by PERL in return for and as part of the acquisition by which it acquired the Beta Assets from the Previous Owners.  That trust, and its governing agreements, were then ratified, endorsed and subsequently further funded by BOC, as PERL's successor in interest, as consideration for PERL's agreement to sell the Beta Assets to BOC and in consideration for the Settlement Agreement BOC reached with, among others, the Previous Owners.  BOC (like the prior owner, PERL) expressly agreed to acquire such assets subject to the burden of that trust.  Therefore, under California law, the Beta Trust is irrevocable.

---

[40] *Estate of Wernicke*, 16 Cal. App. 4th 1069, 1073 (Cal. Ct. App. 1993) ("In 1986, the Legislature repealed Civil Code section 2280 and enacted Probate Code section 15400, which provides in pertinent part: 'Unless a trust is expressly made irrevocable by the trust instrument, the trust is revocable by the settlor.' … The California Law Revision Commission comment to section 15400 states that 'the first sentence of Section 15400 restated part of the first sentence of former Civil Code Section 2280 ... without substantive change.'") (internal citations omitted).

To rule otherwise, finding the Beta Trust to be revocable and allowing BOC to unilaterally modify it would be counter to California law as it would impermissibly "do violence" to either or both of the Beta Asset sale transactions and deprive the Previous Owners of their "bargained-for consideration." *Goss v. Edwards*, 68 Cal. App. 3d at 271-72.

49.     The Previous Owners do not assert these arguments now merely as a matter of convenience.  Indeed, in connection with each of the sales of the Beta Assets, first from the Previous Owners to PERL and then from PERL to BOC, the Previous Owners bargained and negotiated for the placement of cash proceeds (otherwise payable to them as consideration) into the Beta Trust as the most secure form of ensuring that the Beta P&A Obligations will be funded and paid for.  The only other consideration that the Previous Owners have ever received in exchange for the Beta Assets was one dollar.[41]  On its face then, the Previous Owners' agreement to sell the Beta Assets to PERL, and their subsequent agreement to withdraw their objection to PERL's sale of the Beta Assets to BOC, was tied entirely to PERL and then BOC's agreement to fully secure the Beta P&A Obligations with the Beta Trust Funds – that was the overwhelming consideration.  As is evidenced by the history of this property, each time the Beta Trust has been challenged or attacked, the Previous Owners have invested their resources to defend its existence – the Beta Trust was truly valuable consideration in the eyes of the Previous Owners.  Because a trust given for consideration is irrevocable under California law, BOC's claims fail as a matter of law.

---

[41] There was an overriding royalty interest reserved from the sale to be paid from future production, but that was subsequently retired or compromised.

**C.**      **The Previous Owners Cannot Be Compelled To Consent To The Unilateral Release Of Beta Trust Funds To BOC**

50.      Pursuant to the second count of its Complaint, BOC seeks either (i) a determination that the Previous Owners have no right under the Beta Trust Agreement to "veto a direction given by BOEM with respect to the disposition of the *res* of the Beta Trust" or (ii) a "direction to the Previous Owners pursuant to Bankruptcy Code section 1142(b) ordering the Previous Owners to consent to any direction by BOEM to withdraw the Beta Trust *res*."

51.      BOC's second count relies on its first – *i.e.*, to the extent BOC's first count is dismissed, and the Beta Trust Funds are deemed not to be property of BOC's estate, there is no basis for the relief BOC seeks from this Court in its second count. For the reasons stated above, the first count must be dismissed, and on that reason alone, the second count must be dismissed as well.

52.      Even were that not the case, BOC's description of the purported mechanism under which funds are to be released from the Beta Trust, which is the basis of the Complaint's second count, is created out of whole cloth. Specifically, in paragraph 57 of its Complaint, BOC claims that "on May 3, 2016, BOEM instructed the [Beta] Trustee to release the 'Additional Cash Collateral' from the Beta Trust." Even assuming, for purposes of this motion only, that such a direction was issued (and remains valid, which BOEM assures the Previous Owners it does not), this paragraph does not cite any provision under the Beta Trust Agreement under which this "instruction to release the Additional Cash Collateral" was permitted. This is in no way surprising since ***there is no such provision***. Instead, the Amended Beta Trust Agreement provides that the Trustee shall not permit BOC or BOEM to withdraw or transfer any of the assets of the Beta Trust except as expressly provided for under the Amended Beta Trust Agreement:

"…Except as expressly provided in this Agreement (including upon termination of this Agreement pursuant to Section 5.11), *the Trustee shall not permit the Settlor [i.e., BOC] to withdraw or transfer any of the Trust Funds from the Trust Account. The Trustee shall not permit the Beneficiary [i.e., BOEM] to withdraw or transfer from the Trust Account any of the Trust Funds other than as expressly provided for herein*…"  *See*, Beta Trust Agreement, reattached hereto as Exhibit B, § 2.4(a) (emphasis added).

The Amended Beta Trust Agreement provides that the Beta Trust Funds can be transferred (i) to BOC, only when BOC has verified to BOEM and the Previous Owners that it has paid expenses associated with fulfilling its Beta P&A Obligations and (ii) to BOEM, only if and when BOC fails to perform and complete its Beta P&A obligations in a timely manner. *See supra* ¶¶ 31-32. The Previous Owners had no need to "veto" any purported instruction issued by BOEM to "release Additional Cash Collateral" since such instruction was plainly impermissible and void under the terms of the Beta Trust Agreement.  And, in any case, the Previous Owners were within their rights and in compliance with the terms of the Amended Beta Trust Agreement to decline to consent to a withdrawal of the Beta Trust Funds inconsistent with the bases under which such funds could be withdrawn.

53.     Cloaking its second count as a request for a "direction to the Previous Owners pursuant to Bankruptcy Code section 1142(b)" does not allow BOC to fare any better.  As multiple Courts of Appeal, including the Fifth Circuit, have recognized, Section 1142(b) does not confer any substantive rights on any party other than what a confirmed plan provides. *U.S. Brass Corp. v. Travelers Ins. Grp.* (*In re U.S. Brass Corp.*), 301 F.3d 296, 306 (5th Cir. 2002) ("§ 1142(b) does not confer substantive rights … it empowers the bankruptcy court to enforce the unperformed terms of a confirmed plan."); *In re Snowville Farms, LLC v. Barnes Banking Co.* (*Snowville Farms, LLC*), Case Nos. UT-06-034, 04T-36559, 2007 WL 1302154, at *4 (B.A.P. 10th Cir. May 4, 2007) (same); *Vill. of Rosemont v. Jaffe*, 482 F.3d 926, 935 (7th Cir.

2007)(same).  In this case, BOC's Plan does not mandate that the Beta Trust Funds be released from the Beta Trust at any party's direction.  To the contrary, all of the Previous Owners' rights with respect to the Beta Trust were expressly reserved per the terms of the Confirmation Order.  *See* Confirmation Order, ¶ 52.  Because there is no plan provision to enforce with respect to any purported BOEM "direction," Section 1142(b) simply has no applicability.  The Complaint's second count must therefore be dismissed.

**D.     BOC Has Conceded Plan Section 4.3(b)(i)'s Proposed Treatment Of The Previous Owners' Interests In The Beta Trust Funds Would "Impair" Those Interests**

54.     In the third count of its Complaint, BOC seeks a "declaration" that its proposal to substitute the Beta Trust Funds with Beta Replacement Securities in accordance with Section 4.3(b)(i) of the Debtors' Plan would not render the Previous Owners "impaired" under the Bankruptcy Code.  The Plan and Confirmation Order each provide to the contrary – *i.e.*, that treating the Previous Owners' interests in accordance with Section 4.3(b)(i) of the Plan would leave the Previous Owners "impaired" under the Bankruptcy Code.  *See* Plan [Bankr. D. I. 341], § 4.3(c)("The Beta Trust Claims are Impaired."); Confirmation Order [Bankr. D. I. 344],  ¶ J(8) ("Pursuant to Sections 3 and 4 of the Plan, in accordance with section 1123(b)(1) of the Bankruptcy Code … claims in Class 3 (Beta Trust Claims) … are Impaired.");    Confirmation Order [Bankr. D. I. 344],  ¶ J(3) ("Sections 3 and 4 of the Plan specific that Claims in Class 3 (Beta Trust Claims) … are Impaired...").  At a minimum, these are judicial admissions of BOC, but its is also now a finding and order of this Court as to the impact of Section 4.2(b)(i).  This count must therefore be dismissed.

55.     Alternatively, like the prior count, BOC's third count relies on its first — *i.e.*, to the extent BOC's first count is dismissed, and the Beta Trust Funds are deemed not to be property of BOC's estate, there is no basis for the relief BOC seeks in its third count.  For the

reasons stated above, the first count is subject to dismissal, and therefore the third count must be dismissed as well.

**E.     BOC Cannot Cram Down Plan Section 4.3(b)(i)'s Proposed Treatment Of The Previous Owners' Interests In The Beta Trust Funds**

56.     As with the prior counts, the fourth count in BOC's Complaint – which seeks to cram down BOC's proposed treatment of the Previous Owners' interests in the Beta Trust Funds in Section 4.3(b)(i) of the Plan under Bankruptcy Code Section 1129 – is dependent on the first count's success.  If the first count is dismissed, and the Beta Trust Funds are deemed not to be property of BOC's estate, BOC has no authority to propose any treatment with respect to such non-estate assets.  For the reasons stated above, the first count is subject to dismissal, and therefore the fourth count must be dismissed as well.[42]

**F.     The Previous Owners Have Not Filed Any Claims**

57.     In the fifth count of its Complaint, BOC seeks an order disallowing the Previous Owners' "claims."  While the basis for such an allegation is difficult to ascertain, to the extent the claims referenced therein are claims filed or asserted by the Previous Owners as creditors in

---

[42] Even if the first count is not dismissed, the fourth count is nonetheless subject to dismissal for the independent reason that, as a matter of law, a replacement lien on the proceeds of insufficiently-identified sureties cannot provide the Previous Owners' with the indubitable equivalence of their secured, priority interest in the cash that constitutes the Beta Trust Funds. Indubitable equivalence requires that proposed substitute collateral "not increase" an interest holder's "risk exposure." *Arnold & Baker Farms v. United States (In re Arnold & Baker Farms)*, 85 F.3d 1415, 1422 (9th Cir. 1996).  As demonstrated most recently in arguments put forth by Aspen in the Venoco bankruptcy, that is certainly ***not*** the case in instances where a debtor suggests substituting sureties for cash since surety providers have claimed the ability ***to unilaterally cancel surety bonds***, unless obligors such as BOC post collateral equal to the full amount of all outstanding bonds, upon request. *See* Motion of Aspen American Insurance Company & Aspen Specialty Insurance Company, *In re Venoco, LLC, et al.*, No. 17-10828-KG (KJC) (Bankr. D. Del. 2017) [D.I. 266]; *see also Palm Energy Grp., LLC v. Greenwich Ins. Co. (In re Tri-Union Dev. Corp.)*, 479 B.R. 425, 437 (Bankr. S.D. Tex. 2012)(dispute with surety provider over obligation to cover plugging and abandonment costs).  Given this, it is perhaps unsurprising that BOC no longer refers to Aspen in its Complaint, as being an issuer of the Beta Replacement Sureties, despite having referred to them as such in the Disclosure Statement. *Compare* Disclosure Statement [Bankr. D.I. 227] at p. 37 (noting that Beta Replacement Sureties are "listed in further detail on Exhibit D" to Debtors' Surety Motion, which motion in turn identifies five bonds for which BOC's predecessor in interest is the obligor,  $31 million worth of which were provided by "Argonaut Insurance" as surety and $32.8 million worth of which were provided by "Aspen" as surety) with Complaint, ¶ 62 (noting that the Beta Replacement Sureties "will be issued by Argonaut Insurance Company" without any reference to Aspen).

the bankruptcy case, the Previous Owners have not filed any claims in BOC's case or any of the other Debtors' cases – they are not creditors of the Debtors' estates.  This count is therefore meaningless and must be dismissed.

**G.    The New Treatment Of The Previous Owners' Interests In The Beta Trust Funds Proposed By Count VI Is Inconsistent With The Debtors' Approved Plan**

58.     In the sixth and final count of its Complaint, citing to Section 552(a) of the Bankruptcy Code, BOC seeks an order under which, if it is ever "required by BOEM to provide additional security" "in excess of the current *res* of the Beta Trust" including but not limited to "additional collateral or bonds" the Previous Owners should be deemed not to have a interest in such additional security.  *See* Complaint, ¶¶ 110, 111.  As an initial matter, this claim is barred by the Plan and Confirmation Order, which contemplated either leaving the Previous Owners' interest relating to the Beta Assets unaffected or, alternatively, treating them in accordance with Section 4.3(b)(i) of the Plan.[43]  In that regard, even if applied, not only does Section 4.3(b)(i)'s proposed treatment of the Previous Owners' interest not contemplate any such limiting orders with respect to the Previous Owners' liens, it expressly contemplates just the opposite – *i.e.*, that the Previous Owners' liens will attach to the proceeds of whatever security BOEM may at any time require.[44]  This claim is therefore subject to dismissal on that basis alone.

59.     In addition, BOC's claim must also be dismissed for the independent reason that Section 552(a) is inapposite under the circumstances of this case.  Section 552(a) applies only in

---

[43] Pursuant to the Confirmation Order, unless and until a "Subsequent Order" (as defined by the Plan) is entered (if ever), approving Debtors' proposed unilateral release of the Beta Trust Funds, "all of the rights, claims and defenses" of the Previous Owners with respect thereto are preserved.  *See* Confirmation Order, ¶ 52; Plan, § 1.141. And once a Subsequent Order is issued or once Debtors fail to prosecute proceedings seeking such an order for 120 days, the Previous Owners' interests can be treated in only one of two ways – in accordance with Section 4.3(b)(i) of the Plan or in accordance with 4.3(b)(ii) of the Plan.  No other treatment is contemplated or permitted by the Plan or the Confirmation Order.

[44] *See* Plan Section 4.3(b)(i) (providing that if the Debtors ever "obtain new sureties to secure performance of the Beta P&A Obligations" in addition to the Beta Replacement Sureties, the Debtors "shall grant to the Beta Previous Owners a lien in the proceeds of such additional replacement sureties").

instances in which debtors acquire new property postpetition.  In that circumstance, unless it constitutes the proceeds, products, offspring, or profits of property already subject to a pre-petition security agreement, such property will not be subject to "any lien resulting from any security agreement entered into by the debtor before the commencement of the case."  11 U.S.C. § 552(a).  However, in instances in which BOEM requires the posting of additional security, BOC would not be acquiring any additional property potentially subject to Section 552.  To the contrary, it would be acquiring an additional *liability* – *i.e.*, the requirement that it further secure its obligations to BOEM.  That the Previous Owners happen to have a junior interest in such further security does not change the analysis.  Section 552(a) does not speak to this situation at all and thus has no bearing on this case.  The final count of BOC's Complaint must therefore also be dismissed.

WHEREFORE, the Defendants respectfully request that this Court enter an order dismissing the Complaint and granting such other and further relief as may be just and equitable.

Dated: October 11, 2017

Respectfully submitted,

**MAYER BROWN LLP**


By:/s/ Charles S. Kelley
Charles S. Kelley
State Bar No. 11199580
Southern District of Texas Bar No. 15344
700 Louisiana Street, Suite 3400
Houston, TX 77002-2730
Telephone: 713 238-3000
Facsimile: 713 238-4888

and

Sean T. Scott (admitted *pro hac vice*)
Aaron Gavant (admitted *pro hac vice*)
71 South Wacker Drive
Chicago, IL 60606
Telephone: 312 782-0600
Facsimile: 312 701-7711

**ATTORNEYS FOR THE PREVIOUS OWNERS**

## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2017, the foregoing *Defendants' Motion to Dismiss the Complaint Pursaunt to Fed. R. Civ. P. 12(b)(6)* has been served on all parties of record via the Court's ECF system.

/s/ Charles S. Kelley
_____

725301801