

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
01/19/2018

| | | |
|---|---|---|
| IN RE: | § | |
| **MEMORIAL PRODUCTION PARTNERS** | § | **CASE NO: 17-30262** |
| **LP** | § | |
|     Debtor(s) | § | |
| | § | **CHAPTER  11** |
| | § | |
| **BETA OPERATING COMPANY, LLC** | § | |
|     Plaintiff(s) | § | |
| | § | |
| **VS.** | § | **ADVERSARY NO. 17-3365** |
| | § | |
| **AERA ENERGY LLC,** *et al* | § | |
|     Defendant(s) | § | |

## <u>MEMORANDUM OPINION</u>

Beta Operating Company, LLC filed this adversary proceeding against Aera Energy LLC, Noble Energy, Inc., and SWEPI LP (the "Previous Owners") requesting an order: determining that the funds within the Beta Trust are property of Beta's bankruptcy estate; determining that the Previous Owners do not have a right to veto the Bureau of Ocean Energy Management's ("BOEM") disbursement orders with respect to the Beta Trust funds; declaring that the Previous Owners' Class 3B claims are unimpaired under Beta's chapter 11 plan; alternatively, determining that the plan provides the Previous Owners with the indubitable equivalent of their claims; disallowing the Previous Owners' claims as contingent claims for reimbursement or contribution; and ordering that the Previous Owners hold no claim against any additional security provided by Beta to BOEM in excess of the Beta Trust funds.

Beta subsequently filed a motion for partial summary judgment seeking a determination of its claims, a determination that the Previous Owners have no right to veto a direction given by BOEM with respect to the substitution of current Beta Trust funds with performance bonds by

Beta, and an order requiring the Previous Owners to execute or deliver any instrument required to effect a transfer of the funds.

The Previous Owners moved to dismiss Beta's complaint pursuant to FED. R. CIV. P. 12(b)(1), (6), and (7), arguing that: Beta's complaint does not fall within the Court's "arising under" or "arising in" jurisdiction; Beta released its claims within various settlement agreements; the Beta Trust funds are not property of Beta's estate; the agreements related to the Beta Trust do not allow Beta to substitute the Trust's current funds without the Previous Owners' consent; and that Beta failed to join BOEM as a necessary party.

Beta's motion for partial summary judgment is granted in part because the rights of the Previous Owners are not impaired under the confirmed plan.  The Previous Owners' motions to dismiss are denied.

## Background

The Previous Owners—Aera Energy LLC, Noble Energy, Inc., and SWEPI LP—formerly owned certain petroleum assets (the "Beta Assets") located in federal waters off the coast of Southern California.  (ECF No. 1 at 2).  The Beta Assets are leased from the federal government pursuant to three separate Outer Continental Shelf leases and include two wellbore production platforms with permanent drilling equipment systems and one production handling and processing platform.  (ECF No. 1 at 7–8).  In late 2006 and early 2007, the Previous Owners executed purchase and sale agreements that assigned their interests in the Beta Assets to Pacific Energy Resources Ltd. ("PERL").   (ECF No. 1 at 8; *see* ECF No. 12-3; ECF No. 12-6; ECF No. 12-7).

As the buyer of the Beta Assets, PERL assumed liability for the plugging and abandonment obligations associated with those Assets.  (ECF No. 1 at 9).  PERL agreed to pay

all costs and expenses associated with the assumed obligations. (ECF No. 12-3 at § 11.09(a), (b); ECF No. 12-6 at § 11.06(a), (b); ECF No. 12-7 at § 9.06(a), (b)). However, the Previous Owners remain jointly and severally liable to the United States for the obligations pursuant to relevant federal regulations. *See* 30 C.F.R. § 556.604(d).

Because of Aera's continuing liability for plugging and abandonment obligations connected to the Beta Assets, PERL agreed to provide a bond in the amount of $90 million for Aera's benefit; this security could be in the form of a letter of credit, a cash deposit, U.S. Treasury notes, an escrow account, or a performance bond. (ECF No. 12-3 at § 11.09(b)). The Aera purchase and sale agreement required PERL to maintain the Aera bond until all of the plugging and abandonment obligations had been performed or all expenditures were fully credited against the penal sum of the bond, whichever came earlier. (ECF No. 12-3 at § 11.09(b)).

PERL could reduce the amount of the Aera bond if required to provide performance bonds or other security to the Minerals Management Service ("MMS") and its eventual successor, the Bureau of Ocean Energy Management ("BOEM"), for its plugging and abandonment obligations. (ECF No. 12-3 at § 11.09(c)). Each of the Previous Owners agreed to accept subordinate security interests in each governmental bond, the proceeds of those bonds, and any substitute or replacement security MMS and BOEM required to secure PERL's performance of its obligations. (*See* ECF No. 12-3 at § 11.09(h); ECF No. 12-6 at § 11.06; ECF No. 12-7 at § 9.06).

Ultimately, PERL provided MMS with a U.S. Treasury Note in the amount of $90 million that covered its estimated abandonment liability and granted the Previous Owners a subordinate security interest in the Note. (ECF No. 1 at 14). PERL then placed the Note's

proceeds into the Beta Trust. (ECF No. 1 at 14). The Beta Trust is governed by the Supplemental Bond for Decommissioning Liabilities Trust Agreement (the "Beta Trust Agreement"). The Beta Trust Agreement provides that PERL is the Settlor, U.S. Bank National Association is the Trustee, and MMS (now BOEM) is the Beneficiary of the Beta Trust. (ECF No. 1 at 14). The Beta Trust Agreement is governed by California law. (ECF No. 14-2 at § 5.12). The Previous Owners are not parties to the Beta Trust Agreement. (*See* ECF No. 14-2).

Taken in the light most favorable to the Previous Owners, Aera and SWEPI are intended third-party beneficiaries of the Beta Trust Agreement with subordinated security interests in the Note. (ECF No. 1 at 14; ECF No. 14-2 at § 2.6(c)). The Previous Owners will never be entitled to any distribution of funds from the Beta Trust; rather, upon the completion of PERL's plugging and abandonment obligations, U.S. Bank is required to transfer any remaining Beta Trust funds to PERL (now Beta). (ECF No. 14-2 at §§ 4.4(d), 5.11). U.S. Bank (as Trustee) agreed to comply with all orders and directions from MMS (as Beneficiary) without any consent rights being granted to the Previous Owners; however, U.S. Bank (as Trustee) could not comply with any direction from Aera or SWEPI (who hold subordinate liens on the collateral) without the consent of MMS. (ECF No. 14-2 at § 2.4(a)).

On March 8, 2009, PERL filed a chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of Delaware. (Case No. 09-10785). PERL moved to sell the Beta Assets to Rise Energy Beta, LLC (which later merged into Beta) and SP Beta Properties, LLC. (ECF No. 1 at 16). Aera and Noble filed objections to the proposed sale, which were resolved by the execution of the Settlement Agreement between PERL, Rise, and the Previous Owners. (ECF No. 1 at 16). Pursuant to the Settlement Agreement, Rise agreed not to impair

the Previous Owners' existing rights in the Beta Trust Agreement.  (ECF No. 14-5 at § 3.2(b)).

Additionally, the Previous Owners acknowledged that the Note proceeds held within the Beta

Trust could be reduced to less than $90 million and other security provided to maintain the $90

million balance required for the Beta Trust.  (ECF No. 14-5 at § 3.2(c)).  The "other security"

could have included U.S. Treasury notes, an escrow account at a federally-insured national

financial institution, or a performance bond.  (ECF No. 14-5 at § 3.2(c)).  Based upon these and

other agreements, the bankruptcy court approved the sale of the Beta Assets to Rise on

December 23, 2009.  (ECF No. 1 at 16).

Effective May 14, 2010, MMS, Rise, and U.S. Bank executed an amendment (the "Beta

Trust Amendment") to the Beta Trust Agreement.  (ECF No. 14-6).  None of the Previous

Owners are parties to the Beta Trust Amendment; however, Aera and SWEPI remained intended

third party beneficiaries while Noble was added as a "notice party" to the Beta Trust Agreement.

(ECF No. 14-6 at 2).  The Beta Trust Amendment raised the estimated abandonment liability of

Rise to $152 million and required the balance of the Trust to be increased accordingly to $152

million by December 31, 2016.  (ECF No. 14-6 at § 2.2(a)).  To achieve this increase, Rise

agreed to make minimum quarterly payments of $1,250,000.00 into the Trust.  (ECF No. 14-6

at § 2.2(a)).  Rise succeeded in making all of the necessary deposits to achieve the required

increase in the Beta Trust's balance.  (ECF No. 1 at 19).

In 2016, BOEM, as the successor to MMS, agreed to the replacement of $62 million in

cash from the Trust with an equal amount in surety bonds.  (ECF No. 1 at 19).  On April 7, 2016,

Rise submitted to BOEM surety bonds issued by Argonaut Insurance Company and Aspen

American Insurance Company in the aggregate amount of $62 million, which BOEM formally

acknowledged and accepted.  (ECF No. 1 at 19).  Consequently, on May 3, 2016, BOEM

instructed U.S. Bank to release the $62 million in cash from the Trust to the benefit of Rise. (ECF No. 1 at 19).   U.S. Bank, however, requested the consent of the Previous Owners to BOEM's instruction before the cash was released to Rise.   (ECF No. 12-1 at 24).   This request by U.S. Bank failed to give full recognition to § 2.4(a) of the Beta Trust Agreement.[1]   (ECF No. 12-1 at 24).   The Previous Owners refused to consent to BOEM's instruction to U.S. Bank; Beta argues that this refusal was improper based upon the Previous Owners' statements incorporated into the Settlement Agreement, each of the Previous Owners' purchase and sale agreements, and § 2.4(a) of the Beta Trust Agreement.   (ECF No. 12-1 at 24).

On January 16, 2017, Beta and other affiliated entities filed for chapter 11 bankruptcy. (Jointly Administered Case No. 17-30262).   Shortly thereafter, Beta and the other Debtors filed a disclosure statement (Case No. 17-30262, ECF No. 19) and chapter 11 plan (Case No. 17-30262, ECF No. 18).   (ECF No. 14 at 9).   The proposed plan classified any claim held by the Previous Owners arising from or related to the Beta Trust Agreement and all other agreements executed in connection with the Beta Trust as Class 3B claims.   (Case No. 17-30262, ECF No. 17 at § 1.21). The plan allowed the Debtors, in their sole discretion, to either substitute some or all of the $152 million of cash collateral in the Beta Trust with surety bonds approved by BOEM, leaving the Previous Owners with a lien on the surety bonds and any remaining cash in the Beta Trust, or provide the Previous Owners with whatever other treatment that would render their claims unimpaired.   (Case No. 17-30262, ECF No. 17 at § 4.3(b)).

As part of their chapter 11 plan, the Debtors assumed all executory contracts and unexpired leases to which they were parties except for those previously assumed or rejected by

---

[1] Section 2.4(a) of the Beta Trust Agreement provides: "The Trustee shall comply with all orders and directions with respect to the Trust Funds from the Beneficiary and the Predecessors without further consent from the Settlor; provided that the Trustee *shall not comply with any orders or direction from the Predecessors* unless the Beneficiary consents thereto."   (ECF No. 14-2 at § 2.4(a) (italicized emphasis added)).   The Previous Owners qualify as "the Predecessors."   (ECF No. 14-2 at §§ 1.2, 2.6(c)).

final order of the Court, those specifically designated as rejected, or those subject to a separate motion to assume or reject.  (Case No. 17-30262, ECF No. 18 at § 8.1).  To the extent deemed executory contracts, the Debtors assumed all of the Beta Trust governing agreements—the Beta Trust Agreement, the Beta Trust Amendment, the Settlement Agreement, and the Previous Owners' purchase and sale agreements.  (*See* Case No. 17-30262, ECF No. 283 at 279 ("The Debtors do not currently intend to reject any executory contracts or unexpired leases.")).

The Previous Owners opposed the plan based upon the proposed replacement of the Beta Trust's cash funds with surety bonds.  (ECF No. 12-1 at 25).  It is undisputed that the replacement of the cash with the surety bonds will only occur if BOEM consents to the replacement in accordance with § 2.4(a) of the Beta Trust Agreement  The Previous Owners stipulated that the plan could be confirmed if the Previous Owners' rights were reserved as to arguments against the plan's treatment of their claims.  (ECF No. 333 at 15).  On April 14, 2017, the Court confirmed the plan overall but deferred confirmation of the plan's treatment of the Previous Owners' Class 3B claims until entry of a subsequent order.  (ECF No. 12-1 at 25; Case No. 17-30262, ECF No. 344).

Pursuant to their chapter 11 plan, the Debtors proposed to substitute all of the Beta Trust funds with $62 million in dual-obligee performance bonds and $90 million in U.S. Treasury notes.  (ECF No. 12-1 at 25).  On July 20, 2017, the Debtors presented this proposal to BOEM and the Department of the Interior; BOEM confirmed that the proposal was compliant with governing federal regulations.  (ECF No. 12-1 at 25–26).

On April 27, 2017, Rise merged into Beta.  (ECF No. 1 at 7).

After the Previous Owners again refused to consent to the substitution of the Beta Trust funds, Beta filed this adversary proceeding.  (ECF No. 1).  Beta's complaint seeks:

i.   A declaration that the Beta Trust funds constitute property of Beta's bankruptcy estate under 11 U.S.C. § 541 because Beta collateralized Beta's plugging and abandonment obligations, funded the Trust, and, upon satisfaction of its obligations, will receive any remaining Trust funds;

ii.   A declaration that the Previous Owners hold no right to veto BOEM's direction to U.S. Bank because the Amended Beta Trust Agreement does not require the Previous Owners' consent in such a scenario;

iii.   A declaration that all Class 3B claim holders are unimpaired under the chapter 11 plan because the Previous Owners' purchase and sale agreements, as well as the Settlement Agreement, anticipate and allow the Beta Trust funds to include performance bonds;

iv.   Approval of the plan's treatment of Class 3B claims pursuant to 11 U.S.C. § 1129(a)(8)(B), (b)(1), and (b)(2)(A) because the Previous Owners' claims are unimpaired, the plan does not discriminate against their claims, and the substituted Trust funds are the indubitable equivalent of the original cash and Note within the Trust;

v.   Disallowance of the Previous Owners' claims as contingent claims under 11 U.S.C. § 502(e) for reimbursement or contribution because the Previous Owners are co-liable with Beta for the plugging and abandonment obligations burdening the Beta Assets; and

vi.   A limitation of any claim by the Previous Owners for a post-petition lien on any security provided to BOEM in excess of the required fund amounts pursuant to 11 U.S.C. § 552(a).  (ECF No. 1 at 24–32).

On September 19, 2017, Beta filed a motion for partial summary judgment. (ECF No. 12).  Beta's motion seeks summary judgment as to Beta's claims that the Previous Owners' Class 3B claims are unimpaired by the Debtors' chapter 11 plan and that they hold no

right to veto the substitution of the current Beta Trust funds.  (ECF No. 12-1 at 9).  In Beta's opinion, because the performance bonds proposed as substitute funds for the Beta Trust are acceptable as security under the Settlement Agreement and the Previous Owners' purchase and sale agreements, and because the Previous Owners hold no right to veto such a substitution under the Beta Trust Agreement, the Previous Owners' claims are unimpaired under the plan. (ECF No. 12-1 at 27–28).  As set forth below, the Court sustains this argument.

Beta's motion also seeks summary judgment on Beta's claim that, even if the chapter 11 plan does impair the Previous Owners' rights, the plan provides the Previous Owners with the indubitable equivalent of their claims.  (ECF No. 12-1 at 9).  Specifically, Beta asserts that, like the current Beta Trust funds, its proposed performance bonds provide sufficient stability and liquidity for BOEM and the purpose of the Beta Trust.  (ECF No. 12-1 at 46).  Beta also claims that the Previous Owners' acceptance of a subordinate interest in the Note illustrates the Previous Owners' belief in the adequacy of the proposed bonds.  (ECF No. 12-1 at 46).  Because Beta's first argument is sustained, we do not address this alternative argument.

On October 11, 2017, the Previous Owners filed motions to dismiss Beta's complaint pursuant to FED. R. CIV. P. 12(b)(1), (6), and (7).  (ECF No. 14; ECF No. 15).  The Previous Owners first argue that Beta's complaint must be dismissed for lack of subject matter jurisdiction pursuant to FED R. CIV. P. 12(b)(1) because Beta's claims do not "arise under" or "arise in" the Bankruptcy Code or its bankruptcy case since this proceeding fails to impact the feasibility of the Debtors' now-confirmed bankruptcy plan and Beta's future business plan.  (ECF No. 15 at 3). Instead, this proceeding relates only to the interpretation under non-bankruptcy law of the governing agreements and how those agreements affect the Previous Owners' and BOEM's interests in the Beta Trust.  (ECF No. 15 at 3–4).

The Previous Owners next argue that, because BOEM's interests in the Beta Trust may be affected by Beta's claims, BOEM is an indispensable party to the adversary proceeding. (ECF No. 15 at 7).  Consequently, the Previous Owners assert that Beta's failure to join BOEM to the proceeding requires the dismissal of Beta's complaint pursuant to FED. R. CIV. P. 12(b)(7). (ECF No. 15 at 7).

The Previous Owners finally argue that Beta's complaint must be dismissed pursuant to FED. R. CIV. P. 12(b)(6) because: (i) the Beta Trust funds do not constitute property of Beta's bankruptcy estate; (ii) no provision in the governing agreements allows Beta to substitute the performance bonds for the current Beta Trust funds; (iii) no provision in the governing agreements allows Beta to amend the Beta Trust Agreement or withdraw funds from the Beta Trust without the Previous Owners' express consent; and (iv) as a matter of law, Beta could not reject the governing agreements in its bankruptcy case nor revoke the underlying Trust under applicable law.  (ECF No. 14 at 2–3).

 On December 11, 2017, the Court held a hearing on the parties' motions.  The Court ordered the parties to submit briefing on what the term "and other property in the Trust Account" means within the definition of "Trust Funds" found in the Beta Trust Agreement.  (ECF No. 14-2 at § 1.2).  The Court specifically sought arguments regarding whether this term, in the context of the definition of "Trust Funds," allows the substitution of current Beta Trust funds with the proposed performance bonds.  The Court took the parties' motions under advisement on December 29, 2017.

## Analysis

### *Subject Matter Jurisdiction*

The Court is required to first analyze whether it has subject matter jurisdiction over

Beta's claims before considering any other challenge to those claims "because the court must find jurisdiction before determining the validity of a claim." *In re Dinastia, L.P.*, 381 B.R. 512, 518 (S.D. Tex. 2007) (citing *Moran v. Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994)). In ruling on a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, "a district court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *MDPhysicians & Assoc., Inc. v. State Bd. of Ins.*, 957 F.2d 178, 181 (5th Cir. 1992) (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)). To make such a ruling, a court may rely on: "(1) the complaint alone, (2) the complaint supplemented by undisputed facts evidenced in the record, or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Id.* at 181 n.2. Subject matter jurisdiction is determined at the time the complaint is filed. *Carney v. Resolution Trust Corp.*, 19 F.3d 950, 954 (5th Cir. 1994) (citing *Rosa v. Resolution Trust Co.*, 938 F.2d 383, 392 n.12 (3d Cir.), *cert. denied*, 502 U.S. 981 (1991)).

Federal courts are courts of limited jurisdiction, possessing only the power granted to them by the Constitution and statute. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). It is presumed that a cause lies outside of a federal court's limited jurisdiction with the burden to establish jurisdiction on the party asserting such jurisdiction. *Id.*

Whether the Court has subject matter jurisdiction over this proceeding is affected by whether the proceeding arose before or after confirmation of the Debtors' chapter 11 plan. Under Fifth Circuit precedent, the Court's subject matter jurisdiction over this matter becomes much narrower if the dispute arises after confirmation of a debtor's plan. *See, e.g.*, *In re Craig's Stores of Texas, Inc.*, 266 F.3d 388, 390 (5th Cir. 2001) ("After a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other

than for matters pertaining to the implementation or execution of the plan."); *In re U.S. Brass Corp.*, 301 F.3d 296, 305 (5th Cir. 2002) ("[T]he motion pertains to the plan's implementation or execution and therefore satisfies the Craig's Stores test for post-confirmation jurisdiction.").

Although Beta filed this proceeding approximately four months after confirmation of the Debtors' chapter 11 plan, the dispute over the substitution of current Beta Trust funds with the proposed performance bonds arose before and during the plan confirmation process.  (ECF No. 12-1 at 24–25).  Additionally, the parties reserved resolution of this dispute within the plan itself.  (ECF No. 35 at 16; Case No. 17-30262, ECF No. 344 at 160–61).  These facts more closely resemble those in *Newby v. Enron Corp.*, 535 F.3d 325, 335 (5th Cir. 2008), where the Fifth Circuit held that the bankruptcy court did not lose jurisdiction over claims asserted pre-confirmation and involving pre-confirmation activities by virtue of plan confirmation, than those in *Craig's Stores*, 266 F.3d at 391, which involved post-confirmation claims based on post-confirmation activities.  Accordingly, if the Court has subject matter jurisdiction over this proceeding, such jurisdiction is pre-confirmation subject matter jurisdiction and thus not subjected to the Court to the Fifth Circuit's narrower test for post-confirmation jurisdiction.

The fundamental issue in this proceeding is whether the substitution of surety bonds for the cash within the Beta Trust results in an impairment of the Previous Owners' interests *under the plan.*  This issue was explicitly reserved at confirmation and was integral to the confirmation decision.  (ECF No. 12-1 at 25; Case No. 17-30262, ECF No. 344).

Pursuant to 28 U.S.C. § 1334(b), a bankruptcy court holds jurisdiction only over proceedings "arising under" Title 11, proceedings "arising in" a case under Title 11, and proceedings "related to" a case under Title 11.  28 U.S.C. § 1334(b); *Wood v. Wood (In re Wood)*, 825 F.2d 90, 92 (5th Cir. 1987).  "Arising under" jurisdiction involves causes of action

created or determined by Title 11.  *In re Wood*, 825 F.2d at 96.  "Arising in" jurisdiction involves claims that are not based on any particular provision of Title 11 but that have no existence outside of bankruptcy.  *Id.* at 97.

"Related to" jurisdiction exists if "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy."  *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 n.6 (1995) (citing *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)).  The Fifth Circuit has further stated that "an action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options or freedom of action (either positively or negatively) and . . . in any way impacts upon the handling and administration of the bankrupt estate."  *U.S. Brass Corp.*, 301 F.3d at 304.  "Related to" bankruptcy proceedings include "(1) causes of action owned by the debtor which become property of the estate pursuant to 11 U.S.C. § 541, and (2) suits between third parties which have an effect on the bankruptcy estate."  *Arnold v.. Garlock*, 278 F.3d 426, 434 (5th Cir. 2001).  The Fifth Circuit has construed "related to" jurisdiction broadly.  *See TXNB Internal Case v. GPR Holdings L.L.C.*, 483 F.3d 292, 298 (5th Cir. 2007).

Beta asserts that the Court has subject matter jurisdiction over its claims pursuant to "arising under" and "arising in" jurisdiction.  (ECF No. 20 at 12).

This proceeding involves the determination of the extent and nature of the Previous Owners' interests in the Beta Trust funds in order to decide whether the Debtors' chapter 11 plan impairs those interests.  The evaluation and enforcement of a debtor's plan are within a bankruptcy court's subject matter jurisdiction because such actions concern the administration of a debtor's bankruptcy case and may only arise in the context of that case.  *See, e.g.*, *In re Farmland Indus., Inc.*, 567 F.3d 1010, 1018 (8th Cir. 2009) ("'[A]dministrative matters' such as . . . confirmation of plans . . . are the principal constituents of 'arising in' jurisdiction."); *Craig's*

*Stores*, 266 F.3d at 390 ("After a debtor's reorganization plan has been confirmed . . . bankruptcy jurisdiction . . . ceases to exist, other than for matters pertaining to the implementation or execution of the plan."); *see also In re Lothian Oil, Inc.*, 531 F. App'x 428, 441 (5th Cir. 2013) (recognizing a bankruptcy court's subject matter jurisdiction to evaluate and interpret provisions of a confirmed plan); *In re D & P P'ship*, 91 F.3d 1072, 1074 (8th Cir. 1996) ("[A] bankruptcy court may explicitly retain jurisdiction over aspects of a plan related to its administration and interpretation.").

Because this proceeding involves the administration of the Debtors' chapter 11 plan, as well as the impairment status of the Previous Owners' interests and claims by that plan, this proceeding arises only in the context of bankruptcy and is thus within this Court's subject matter jurisdiction.

### Constitutional Authority

Although the Court properly holds subject matter jurisdiction over this proceeding, the Court, as an Article I entity, must still determine whether it holds constitutional authority to enter a final judgment in this proceeding. Within its ruling in *Stern v. Marshall*, the Supreme Court held that a bankruptcy court's ability to enter a final judgment in a case depends on whether the cause of action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process. 564 U.S. 462, 499 (2011). If a bankruptcy court does not possess the necessary constitutional authority to enter a final judgment in a proceeding, the court may still issue interlocutory orders in that proceeding. *Trevino v. HSBC Mortg. Serv. (In re Trevino)*, 535 B.R. 110, 125 (Bankr. S.D. Tex. 2015). An order resolving fewer than all of the claims presented in a complaint is interlocutory. *Id.* at 126.

This opinion does not determine all of the claims presented in this proceeding.  Instead, the Court only determines whether the Debtors' chapter 11 plan impairs the Previous Owners' interests and claims.  Accordingly, the order accompanying this opinion is interlocutory and thus may be entered without a determination of the Court's constitutional authority to enter a final judgment at this time.

Even if this proceeding requires the Court to enter a final judgment, the Court's determination of whether the Debtors' chapter 11 plan impairs the Previous Owners' interests and claims constitutes a "core" bankruptcy proceeding under 28 U.S.C. § 157(b)(2) that stems solely from the bankruptcy itself, particularly the effect and administration of the Debtors' confirmed plan on the Previous Owners' interests.  *WRT Creditors Liquidation Trust v. C.I.B.C. Oppenheimer Corp.*, 75 F.Supp.2d 596, 606 (S.D. Tex. 1999) ("Claims that 'arise under' or 'arise in' a bankruptcy case are 'core' matters."); *In re Morning Treat Coffee Co., Inc.*, 77 B.R. 62, 63 (Bankr. M.D. La. 1987) (finding that a proceeding to interpret and enforce the provisions of a plan of reorganization is a core proceeding).  The fact that the parties' dispute may ultimately require the interpretation of California law regarding trust agreements or contracts does not by itself affect this determination of core status.  *See* 28 U.S.C. § 157(b)(3) ("A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law.").

This finding of an interconnected relationship between this proceeding and Beta's bankruptcy case is additionally supported by the fact that the Previous Owners' arguments stem from their active opposition to the Debtors' plan, the confirmation of which is an integral part of Beta's reorganization.  (ECF No. 12-1 at 25).

Accordingly, the Court holds constitutional authority to enter a final order and judgment with respect to this proceeding.

***Interpretation of the Beta Trust Agreement***

The Beta Trust Agreement is governed by California law.  (ECF No. 14-2 at § 5.12). Under California law, "[t]he language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." CAL. CIV. CODE § 1638.  The interpretation of the contract must be fair and reasonable and not lead to absurd conclusions.  *Bill Signs Trucking, LLC v. Signs Family Ltd. P'ship*, 157 Cal. App. 4th 1515, 1521 (2007).  "The fundamental goal of contract interpretation is to give effect to the mutual intention of the parties. If contractual language is clear and explicit, it governs." *Bank of the West v. Superior Court*, 833 P.2d 545, 552 (Cal. 1992) (citing CAL. CIV. CODE, §§ 1636, 1638).  In interpreting a contract, a court must consider: (i) whether the contract was intended to be the complete and final expression of the parties; and (ii) whether the contract is susceptible to the meaning that the parties gave to it.  *Renwick v. Bennett (In re Bennett)*, 298 F.3d 1059, 1064 (9th Cir. 2002).

Where a contract provision is "clear and unambiguous," it is "not subject to questions of construction or interpretation." *Neal v. State Farm Ins. Cos.*, 10 Cal. Rptr. 781, 783 (1961). "A . . . provision is ambiguous when it is capable of two or more constructions, both of which are reasonable." *Producers Dairy Delivery Co. v. Sentry Ins. Co.*, 718 P.2d 920, 924–25 (Cal. 1986).  "Whether language in a contract is ambiguous is a question of law." *Id.* at 925.

 As noted above, § 2.4(a) of the Beta Trust Agreement provides:

"The Trustee shall comply with all orders and directions with respect to the Trust Funds from the Beneficiary and the Predecessors without further consent from the Settlor; <u>provided</u> that the Trustee *shall not comply with any orders or direction from the Predecessors* unless the Beneficiary consents thereto."

(ECF No. 14-2 at § 2.4(a) (italicized emphasis added)).  Pursuant to this language, U.S. Bank (as Trustee of the Beta Trust) must comply with all orders from BOEM (as Beneficiary) regarding Trust funds.  (ECF No. 14-2 at § 2.4(a)).  However, U.S. Bank cannot comply with any orders from the Previous Owners (as the Predecessors) regarding the Trust funds without BOEM's consent.  BOEM may thus unilaterally direct U.S. Bank regarding the administration of Beta Trust funds.

Of course, the Beta Trust Agreement is a contract.  If the Settlor (Beta) and the sole Beneficiary (BOEM) agree on a substitution of Beta Trust funds, it is irrelevant that the non-party Predecessors (the Previous Owners) may disagree.  The Previous Owners reserved a subordinate lien; not a veto right.  (ECF No. 1 at 14; ECF No. 14-2 at § 2.6(c)).  The contract itself is not ambiguous.

Based upon the language within § 2.4(a), as well as the status of the Previous Owners as non-parties to the Beta Trust Agreement, the Court finds that the Previous Owners may not unilaterally object to any approval by BOEM of a substitution of current Beta Trust funds with the proposed performance bonds.  When presented with Beta's proposal to substitute the current Beta Trust Funds, BOEM did not object nor did it seek the consent of the Previous Owners.  (ECF No. 12-1 at 26).   The Previous Owners thus lack the ability to object to Beta's proposed substitution and their Class 3B claims are left unimpaired by the proposed transaction, which is to be completed only with BOEM's consent.[2]

---

[2] The Court also acknowledges an interesting anomaly.  Various agreements, including the governing agreements, exist between Beta (and its predecessors) and the Previous Owners regarding acceptable collateral and funds for the Beta Trust.  Those documents, when read fairly, would have generally allowed Beta to post bonds rather than cash to the Trust.  The Previous Owners ask the Court to disregard those other agreements and to narrowly read the Beta Trust Agreement.  However, the Previous Owners retained no veto rights within the Beta Trust Agreement.  (ECF No. 1 at 14; ECF No. 14-2 at § 2.6(c)).  While it does not base its decision on this anomaly, the Court cannot simultaneously ignore the other relevant documents and allow the Previous Owners to promote a narrow and inconsistent interpretation of an agreement to which they are not a party.

Accordingly, Beta's motion for partial summary judgment is granted in part.   The Previous Owners' motions to dismiss are denied.

## **Conclusion**

The Court will issue an Order consistent with this Memorandum Opinion.

SIGNED **January 19, 2018.**

_____

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE